**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Richard Jesse RUSMISEL, Defendant-Appellee.**

No. 82–2241.

United States Court of Appeals, Fifth Circuit.

Oct. 3, 1983.

Rehearing Denied Dec. 20, 1983.

James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellant.

Terrence A. Gaiser, Houston, Tex., for defendant-appellee.

Before REAVLEY and JOHNSON, Circuit Judges, and WYZANSKI *, District Judge.

JOHNSON, Circuit Judge:

The Government brings this appeal from the district court's granting of petitioner Rusmisel's 28 U.S.C. § 2255 motion to vacate judgment and sentence in his 1970 criminal trial. The district court granted the motion on the basis of ineffective assistance of counsel. This Court concludes that the trial court was correct in its determination that Rusmisel's counsel failed to render effective assistance and that his ineffectiveness required that the section 2255 motion be granted. The district court's grant of the motion is therefore affirmed.

I. *Facts*

Following indictment by a federal grand jury, Jesse Rusmisel and Milko Lasily were found guilty in June 1970 by a jury of three counts charging violations of law involving nine pounds of marihuana. Count 1 charged that the two defendants, together with Felix Tucker, Jr., an unindicted co-conspirator, conspired to smuggle marihuana into the United States and to transport and conceal the marihuana, knowing it to have been smuggled, in violation of 21 U.S.C. § 176a. Counts 2 and 3 charged the substantive offenses of smuggling and transportation, respectively.[1] Defendants Rusmisel and Lasily received the minimum mandatory sentence of five years' confinement[2] on each of the three counts, the sentences to run concurrently. On direct appeal, defendants alleged only two points of error[3] which this Court, in a per curiam opinion, found to be without merit. The convictions were affirmed. *United States v. Lasily,* 441 F.2d 277 (5th Cir.1971).

Petitioner Rusmisel thereupon fled to Canada[4] where he established permanent residency with his wife and child. During the ten years or more he spent in Canada he became a successful and respected member of the community. In December 1981 he was arrested in New York and returned to the Southern District of Texas.

Rusmisel then filed a motion to vacate sentence and judgment under section 2255. After an evidentiary hearing, the district court granted the motion and granted Rusmisel a new trial. The court granted the motion based on defense counsel's failure to object to the repeated admission of highly inflammatory, prejudicial evidence and on defense counsel's own development of such evidence.[5] This prejudicial evidence con-

---

* District Judge of the District of Massachusetts, sitting by designation.

1. A fourth count, charging a violation of 26 U.S.C. § 4744(a)(2) was not submitted to the jury.

2. The statute imposing the five-year minimum mandatory sentence was repealed by Congress by legislation approved October 27, 1970.

3. The two assignments of error were (1) insufficiency of the evidence and (2) the trial court's limiting the cross-examination of a prosecution witness.

4. Rusmisel was indicted for bond jumping on June 14, 1971, and that case is pending trial.

5. The court added that defense counsel's failure to call character witnesses for the defense, although it would not alone support relief, was a factor supporting the conclusion that counsel did not render reasonably effective assistance. In addition, the court considered Government suppression of certain promises made to a prosecution witness (Rosemary Tucker) as a factor to be considered in granting the § 2255 petition. Although the court mentioned the above factors as supporting the grant of the § 2255 petition, it is clear from the court's

sisted largely of continued questions related to witnesses' personal usage of marihuana and sundry other drugs.

## II. *Ineffective Assistance of Counsel*

[1] In reviewing the district court's determination that Rusmisel received ineffective assistance of counsel, this Court follows the more extensive line of precedent in this Circuit which holds that whether a defendant has enjoyed effective assistance of counsel is a mixed question of law and fact. *See Washington v. Watkins,* 655 F.2d 1346 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The district court's conclusion whether the defendant received effective assistance of counsel is a question of law, not subject to review under the clearly erroneous standard; any subsidiary findings of basic, historical fact[6] made by the district court after the section 2255 evidentiary hearing are subject to review under the clearly erroneous standard

of Rule 52(a). In determining whether Rusmisel received effective assistance of counsel, this Court therefore makes an independent evaluation based on the district court's subsidiary findings.

The sixth amendment guarantees a defendant in a criminal case the right to assistance of counsel. This guarantee entitles the defendant to effective assistance of counsel, that is, counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir.1982) (Unit B, en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). In a motion to vacate judgment and sentence under 28 U.S.C. § 2255, the issue is whether the alleged error or errors constituted a fundamental defect which resulted in a miscarriage of justice. *United States v. Johnson,* 615 F.2d 1125, 1127 (5th Cir.1980). In

opinion that defense counsel's failure to object to the continued inflammatory evidence, coupled with his own development of this evidence, was a sufficient basis for granting the petition. The court stated:

> Defense counsel rarely objected to such evidence, frequently added to it, and after finally making occasional objections, did not pursue those objections on appeal nor did he preserve objections to the closing jury arguments. The inflammatory evidence was not occasional but pervasive and, considering the less than overwhelming evidence against Rusmisel, rendered his trial fundamentally unfair.

> \*   \*   \*   \*   \*   \*

> [T]he Court is convinced that the outcome of this trial was materially and substantially affected by the quality of representation actually rendered to Petitioner.

*Citing Lumpkin v. Ricketts,* 551 F.2d 680 (5th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316 (1977) and *Washington v. Estelle,* 648 F.2d 276 (5th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), the Government contends that the district court cannot grant a § 2255 motion based upon ineffective assistance of counsel in failing to object to improper prosecutorial questions when the "cause" prong of the *Wainwright v. Sykes* bar forecloses federal review of the improper prosecutorial questioning. *Lumpkin v. Ricketts* and *Washington v. Estelle,* however, do not stand for this proposition. In these cases the Court merely held that an allegation of ineffective assistance of counsel will not satisfy the

"cause" requirement, thereby allowing federal habeas review of procedural trial defaults which preclude review in state court. Indeed, this Court in *Washington v. Estelle* reviewed an ineffective assistance claim based partially on counsel's failure to object to bolstering testimony of a state witness. The bolstering testimony itself was not reviewable for failure to demonstrate "cause" for counsel's procedural default.

The Government apparently contends that the "cause" prong of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), bars collateral review of petitioner's ineffective assistance claim because petitioner waited too long after the affirmance of his conviction on direct appeal to bring his § 2255 petition. The Government, however, has not established the predicate for the *Wainwright v. Sykes* analysis—there has been no showing of a procedural default in the sense of a failure by petitioner to comply with a federal rule of procedure. *See Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). The Government has not shown that any federal rule of procedure requires that a petitioner bring an ineffective assistance claim in a § 2255 petition at any particular point in time. Thus, the conceptual framework of the *Wainwright v. Sykes* or the *Davis* analysis does not apply in the instant case.

**6.** These are facts "in the sense of a recital of external events and the credibility of their narrators." *Washington v. Watkins,* 655 F.2d at 1351.

this Circuit, the standard for constitutionally effective assistance of counsel is not errorless counsel and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance. *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974). "[T]he methodology for applying the standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based upon the *totality* of circumstances in the entire record." *Washington v. Estelle,* 648 F.2d at 279 (emphasis in original).[7] The number, nature, and seriousness of the charges against the defendant, the strength of the prosecution's case, the strength and complexity of the defendant's possible defenses, and the severity of the sentence faced by the defendant are all part of the "totality of circumstances in the entire record." *Watkins,* 655 F.2d at 1357.

■ Defense counsel's failure to object to prosecutorial questions about personal drug usage of the various witnesses amounts to ineffective assistance only if the remarks are so prejudicial as to render the trial fundamentally unfair. *Jones v. Estelle,* 632 F.2d 490, 492–93 (5th Cir.1980), *cert. denied,* 451 U.S. 916, 101 S.Ct. 1992, 68 L.Ed.2d 307 (1981); *Jones v. Estelle,* 622 F.2d 124, 126–27 (5th Cir.), *cert. denied,* 449 U.S. 996, 101 S.Ct. 537, 66 L.Ed.2d 295 (1980). If the totality of circumstances in the entire record reflects that the prosecutorial remarks infected the trial with unfairness, the resulting conviction represents a denial of due process. *Jones v. Estelle,* 622 F.2d at 127. It is therefore within the framework of the totality of circumstances that this Court must judge the fundamental fairness of the trial.

In order to determine whether the inflammatory evidence presented by Government counsel and in part continued by defense counsel permeated the trial with unfairness, an overview of the theory of the prosecution and the nature of the evidence

at Rusmisel's 1970 trial is in order. The district court quite ably and succinctly summarized the foregoing information:

In 1970, Rusmisel, Lasily and Tucker, together with others, were members of an unincorporated association known as "the West Mountain Family". The business of the association was the fashioning of quality leather goods for sale at outlets in Fayetteville and Eureka Springs, Arkansas. The three men planned a trip to Mexico for the purpose of purchasing leather for the business. The primary dispute was whether or not the purpose of the trip also involved the purchase of marijuana. Extensive testimony concerned a meeting that occurred in Arkansas, during which the trip was planned and at which many members of the association were present. It was apparently undisputed that at this meeting the possibility of purchasing marijuana on the Mexican trip was mentioned. The Government's version was that it was not only mentioned but agreed upon as an objective. The defense version was that the subject was mentioned by Felix Tucker but that it was quickly dismissed by several members of the group and not mentioned again.

Once the trio got to Mexico, it is again undisputed that Felix Tucker purchased nine pounds of marijuana. The Government version is that the purchase was simply the carrying out of the prearranged objective. On the contrary, Rusmisel and Lasily, while candidly admitting that they witnessed the purchase and knew Tucker intended to violate the law, nevertheless insisted that they totally disassociated themselves from the scheme. Indeed, the defendants testified that they attempted to dissuade Tucker from finally crossing the border with the merchandise and refused to cross the border with him because they were aware that he was violating the law and wanted no part of it. Tucker was arrested and gave a statement substantially in con-

---

7. This standard does not vary depending upon whether counsel was retained or appointed.

*Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

formance with the defense theory, at least to the extent that he took full responsibility for the transaction. Subsequently, after being charged with a crime and consulting with his own attorney, he implicated Rusmisel and Lasily for the first time.

Tucker became the key Government witness at the trial. The other two Government witnesses, apart from Agent Harvey, were Rosemary Tucker and Janet Hatchett. [sic] Their primary contribution related to the Government's version of the pre-trip meeting in Arkansas. Defendants countered with Susan Rusmisel, Walter Lane Lindley and Bob Hale, together with the two defendants. While there was certainly sufficient evidence to convict the defendants, as held by the Fifth Circuit, the evidence was not overwhelming and presented the classic "swearing match."

■ The prosecutor set the tone of the trial with the questioning of the first witness, Felix Tucker. Tucker was questioned about the purpose of the trip to Mexico and testified that it was to obtain leather in Leon and to obtain some marihuana in Guadalajara. Tucker testified that a friend named Mike had given him $100 to purchase marihuana, and that he (Tucker) had made the $100 available to the group to aid in the purchase of leather if needed, and if not, to purchase marihuana. Immediately following this testimony by Tucker the prosecutor began questioning him about

personal usage of drugs by members of the West Mountain Family[8] and their wives.

Q. Now, at that point, when you said you were given a hundred dollars by Mike, I take it you had been smoking marijuana?

A. Yes, Sir.

Q. And I take it that at that time you had been present when others had smoked marijuana?

A. Yes, Sir.

Q. Had you been present when these two smoked?

A. Yes, Sir.

Q. Milko Lasily and Jesse Rusmisel?

A. Yes, Sir.

Q. Lane Lindley?

A. Yes, Sir.

Q. Bob Hale?

A. Yes, Sir.

Q. Several of their wives?

A. Yes, Sir.

Q. Your wife?

A. Yes, Sir.

Q. In other words, in the West Mountain Family, there had been somewhat unrestricted but perhaps intermittent use of marijuana?

A. Yes, Sir.

This particular line of testimony was arguably admissible in order to show motive for the offense. The close relationship of the group and their use of marihuana *prior to and at the time of the Mexico trip* might bear on motive—the group wanted the marihuana for personal use.[9] Although the use

---

**8.** The partners in the West Mountain Family Store were Tucker, Rusmisel, Lasily, Lane Lindley, and Bob Hale.

**9.** We reject, however, the Government's argument that the questions constituted relevant evidence because testimony that the members of the group smoked marihuana tended to make Tucker's version of the events—that one purpose of the Mexico trip was to purchase marihuana for sale and use by the group—more probable and defendants' version less probable. Tucker never testified that a purpose of the trip was to purchase marihuana for sale and use by the group. He merely testified that there existed a dual purpose of the trip—purchase of leather and purchase of marihuana. Indeed, not one witness testified that the

intended purpose of the marihuana purchase was to smuggle it into the United States for personal use by members of the West Mountain Family. Rosemary Tucker, Felix's wife, testified that the purpose of the $100 was "to purchase marijuana for the West Mountain Family" and that her husband was going to set aside a little to sell. She clarified that "for the West Mountain Family" meant for the financial benefit of the members, *i.e.,* that they were "in a little bit of financial difficulty" and were going to try to sell the marihuana in Dallas. Later in the trial, Janet Hatchet testified that the purpose of the proposed marihuana purchase was to take it to Dallas to sell and to use the proceeds in the West Mountain Family Shop.

of marihuana by the family prior to and at the time of the trip may have borne on motive, testimony relating to the use of drugs after the offense, the use of drugs other than marihuana, and the cult stigma attached to the family had no relevance whatsoever. Testimony of this sort constituted an attempt to prove guilt by association.

Rather than objecting to this line of questioning by the prosecution,[10] Rusmisel's own ally." He voiced no objection on the basis of irrelevance or on any other basis.

Again, well into the trial, during cross-examination of defense witness Bob Hale, Rusmisel's attorney objected, this time on the basis of irrelevance, to the prosecutor's question about the number of trips Hale had made to Los Angeles and San Francisco in 1968. (The prosecutor had previously asked Hale whether he had made three trips to these two cities in 1968 in order to purchase LSD and mescaline. Hale had responded that his trips were not for the purpose of purchasing drugs.) Once again, during cross-examination of Hale and after a series of questions relating to Hale's bringing mescaline and LSD from California to Dallas, Rusmisel's attorney objected to the prosecutor's harping on whether Hale actually did return from California with some LSD.

> Q. How many trips did you make in August '68, in 1968, to Los Angeles and San Francisco?
> A. In August 1968?
> Mr. Rocha: He answered that.
> The Court: He can answer it again.
> A. All I can remember is one.
> Q. Could it have been two, in that approximate location?
> Mr. Rocha: Objection, it is irrelevant to the case.
> The Court: I believe he can answer, counsel.
> A. I believe I went twice, one [sic] on vacation for several weeks.
> Q. And did you make it a third time?
> A. No, Sir.
> Q. No third time?
> A. No.
> Q. How much money did you carry with you on the trip, do you recall?
> A. No, Sir.
> Q. Did you have any sum of money to carry out there?
> A. Yes, Sir, I did.
> Q. How much?
> A. Just a couple hundred dollars.
> Q. Just a couple hundred dollars?
> A. I'm not sure, it wasn't a lot.
> Q. When you returned from this area on any one of your trips, did you bring back any mescaline?
> A. Yes, Sir.
> Q. How much?
> A. Fifty, seventy-five, maybe a hundred caps.
> Q. Fifty to a hundred caps?
> A. Yes.

10. As the district court noted, objections from Rusmisel's attorney were infrequent. His first objection came only at the end of another series of questions on personal drug usage addressed to Tucker by the prosecutor:

> Q. Are you now employed and living with your family, Mr. Tucker?
> A. Yes, Sir.
> Q. Are you using drugs now at all?
> A. No, Sir.
> &ast; &ast; &ast; &ast; &ast; &ast;
> Q. On this trip and before this court, you told us that you used peyote, or what you thought was peyote—I take it mescaline comes from peyote?
> A. Yes, Sir.
> Q. Did you use LSD in this drug culture?
> A. Yes, Sir.
> Q. Did others use it in your presence?
> A. Yes, Sir.
> Q. Was the West Mountain Family group at Eureka Springs and Fayetteville, were they part of what you call the drug culture?

It was to this final question that the defense attorney objected.

During redirect of Tucker, Rusmisel's attorney objected to a question concerning whether Rusmisel and Lasily had smoked marihuana in Mexico. His objection was based on the fact that since the smoking occurred in Mexico, the court did not have jurisdiction to consider the crime. Amazingly, Rusmisel's attorney never objected to the repeated testimony about personal usage of marihuana in the United States on the grounds that the defendants were not charged with that crime.

During cross-examination of the defense witness Susan Rusmisel (petitioner's wife) Rusmisel's attorney objected to the fact that the prosecutor questioned the witness about her usage of some drugs that had not been mentioned in previous testimony:

> Q. In your best recollection, when was the last time you used drugs, and that includes mescaline, LSD, marijuana, speed, methadrine or whatever.
> Mr. Rocha: Your Honor, he has now mentioned some drugs that are not even in the testimony.

Again during the prosecutor's cross-examination of Susan Rusmisel, Rusmisel's attorney objected to a question about when the witness had seen the various members of the group using drugs (before or after the group came into existence) on the basis of the prosecutor's dual usage of the terms "collectively" and "as individuals": "Your Honor, I think that is confusing, you cannot be collectively and individu-

attorney chose to do more of the same. The district court noted that Rusmisel's attorney's "strategy was to attempt to outdo the government in the effort to paint each side's witnesses black." A striking example of this strategy occurred during cross-examination of government witness Janet Hatchet when Rusmisel's attorney questioned her about the source of the marihuana she had smoked in her past:

Q. You stated that you have smoked marijuana in the past. Can you tell us where you got the marijuana?

A. Can I tell? It was given to us by people that attended the University of Arkansas.

Q. What is your husband's name, Mrs. Hatchet?

A. James J. Hatchet.

Q. Were you ever in Magnolia, Arkansas?

A. Yes, Sir, I was.

Q. Did your husband write to you at that time when he was your fiance?

A. Yes.

Q. Did you (sic) write to you from Viet Nam?

Mr. Dimmitt: I object to that, whether there is a writing to this lady from Viet Nam or any other country. It has nothing to do with the case.

The Court: The thought occurs to me it may be well taken. Can you tell me what her fiance's writing would have to do with this?

Mr. Dimmitt: She was not married or engaged, but it is immaterial, Your Honor.

Mr. Rocha: I just wanted to ask, Your Honor, if I may, whether or not she smoked marijuana that came from Viet Nam?

The Court: What difference does it make? She told us that she smoked it for an extended period of time. Whether it came from one place or another, I don't think is of any consequence.[11]

The Government argues that the district court incorrectly faulted Rusmisel's attorney for opting to outdo the Government in painting each side's witnesses black rather than for attempting to exclude evidence of drug use by members of the West Mountain Family and their spouses and friends. According to the Government, Rusmisel's attorney might reasonably have concluded that "having all of the witnesses discredited as unreliable drug users offered the best prospect of acquittal for his client." Such a "strategy" was reasonable, argues the Government, because if the jury believed that drug use rendered a witness unreliable, the jury would have been confronted with a Government case that depended entirely on the testimony of unreliable witnesses; given that the Government has the burden of

Q. How much LSD did you bring back?
A. I didn't get any LSD.
Q. You did drop acid, didn't you?
A. Yes.
Q. Did you, on any of those trips, acquire LSD?
A. I think I did while I was on vacation.
Q. So in fact you did come back from California with some LSD?
A. We didn't bring any quantities back.
Mr. Rocha: Your Honor, I object to this.
The Court: You have objected and it has been noted, and you may have a continuing objection. You all have gone into this repeatedly.

After questions on whether Hale had ever observed either Rusmisel or Lasily take marihuana, LSD, or any other drugs, Rusmisel's attorney finally objected when the prosecutor asked Hale: "But you knew they were being used [at the business meetings], did you not,

Mr. Hale?" As the district court so aptly commented: "Only when the cross-examination of Bob Hale began to border on the outrageous did [the defense attorney] object that the questioning was 'irrelevant.'"

11. When Janet Hatchet was recalled as a witness later in the trial, Rusmisel's attorney again attempted to broach the subject of whether Mrs. Hatchet had smoked marihuana sent to her through the mail by her husband in Viet Nam. Again the court sustained an objection by the Government, rejecting the defense argument that the inquiry was important to the credibility of the witness. The trial court's refusal to permit counsel to go into this point with witness Hatchet was one of two issues raised by counsel on appeal. Defense counsel urged a different ground for the admissibility of this evidence on appeal; this Court summarily rejected counsel's argument because it had not been raised in the trial court.

proving guilt beyond a reasonable doubt, the Government would have failed to prove its case. Finally, adds the Government, the testimony of its witnesses was contradicted "by witnesses who were no more or less reliable than were the Government witnesses."

This Court is not persuaded by such convoluted reasoning. In advancing this argument, the Government ignores the primary thrust of its case against the defendants on substantive and conspiracy charges of smuggling and transportation of marihuana—that the Government witnesses had abandoned drugs and the drug culture to lead a moral, law-abiding life but that the defendants and remaining members of the West Mountain Family were still deeply involved in drugs. The only reason the prosecution questioned its own witnesses about their personal usage of drugs was to demonstrate that they had voluntarily left that way of life whereas the defense witnesses had not. This thrust of the prosecution's case was obvious from the direct examination of its first witness, Felix Tucker. The prosecutor was attempting to elicit from Tucker the reason for the discrepancy between the first statement he gave to the authorities and the second statement. (The latter implicated defendants Rusmisel and Lasily.) The prosecutor asked Tucker if he had done any "soul-searching" and Tucker replied that he had:

Q. Did you talk to your wife?
A. I talked to my wife.
Q. Did she come down here to see you in Laredo?
A. Yes, Sir.
Q. Did you discuss with her what you and she had been doing and getting more and more involved in this use of marijuana and that sort of thing?
A. Yes, Sir.
Q. Tell the court and jury just what you went through discussing it with your wife and what decisions you made.
A. We thought a lot about the environment that we had been in for quite

sometime. We had been in this sort of drug culture, I suppose you could call it.
Q. Were you proud of that?
A. No, Sir.
Q. At that time?
A. No, Sir.
Q. Now, at that time, in these discussions with your wife, did you feel that you had been on the right path, so to speak, for your family, your child and your wife?
A. No, sir.
Q. Subsequently, did you give this some thought before you left Laredo?
A. Yes, Sir.
Q. What was your decision, had you made a final decision when you left Laredo and got out on bond?
A. To what?
Q. To what you were going to do?
A. Well, I had made the decision and had told West Mountain Family that I was completely divorcing myself from it.
Q. Taking your family back to Dallas?
A. Yes, Sir, and moving back to Dallas.
Q. Getting a job—you have, I take it, since gotten a job?
A. Yes, sir.

\* \* \* \* \* \*

Q. Are you now employed and living with your family, Mr. Tucker?
A. Yes, Sir.
Q. Are you using drugs now at all?
A. No, Sir.

\* \* \* \* \* \*

Q. Did you use LSD in this drug culture?
A. Yes, Sir.
Q. Did others use it in your presence?
A. Yes, Sir.
Q. Was the West Mountain family group at Eureka Springs and Fayetteville, were they part of what you call the drug culture? [12]

---

12. It was not until this last question that Rusmisel's attorney finally objected. By this time the thrust of the prosecutor's line of questioning was clearly evident.

Similarly, the prosecutor elicited testimony from Rosemary Tucker that she and her husband had divorced themselves from the West Mountain Family. The Government made the same point with witness Janet Hatchet:

Q. Prior to your departure from Eureka Springs, did you on few or many occasions use marijuana?

A. Yes, Sir.

Q. Been around others who were using it and the presence of them using it and you personally using it?

A. Yes, Sir.

Q. When you left Eureka Springs, did you disassociate yourself from the West Mountain Family and the use of marijuana and drugs, did you disassociate yourself from that way of life after you married?

A. Yes, Sir.

Q. You know what I mean by disassociate, did you leave that type of life?

A. Not entirely.

Q. You married and left there, did you go with your husband at that time?

A. Yes, Sir, I did.

Q. Do you feel at this time that your life has been somewhat changed since February 1970?

A. Considerably.

Given the obvious import of the Government's case—that its witnesses had abandoned the West Mountain Family and the drug culture it represented and were therefore believable—the Government cannot now convincingly argue that a defense "strategy" of not objecting to evidence of drug use on the part of the defendants and their associates was a reasonable choice. Given these circumstances, this Court cannot conclude that Rusmisel's attorney could have reasonably determined that allowing the Government to paint the defense witnesses black and responding in kind offered a good chance of acquittal for his clients. Compare *Gray v. Lucas*, 677 F.2d 1086, 1094 (5th Cir.1982). Indeed, this court is hard pressed to accord the appellation of "trial strategy" to defense attorney's manner of conducting the trial. In *Daniels v. Maggio*, 669 F.2d 1075, 1079 (5th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 295, 74 L.Ed.2d 278 (1982), we stated that "a conscious and informed decision on trial tactics cannot be the basis for constitutionally ineffective representation unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Assuming, without deciding, that counsel's decision was conscious and informed, in this case the "strategy" was so ill chosen that it rendered the trial fundamentally unfair.

An excerpt from the Government's cross-examination of defense witness Susan Rusmisel is illustrative of how defense counsel's strategy of nonobjection permeated the trial with fundamental unfairness. Testimony on personal usage of drugs constitutes six pages of transcript *de suite*, resumes a page later and continues for three more pages. Susan Rusmisel's primary testimony on a very brief direct examination was that the members of the West Mountain Family group had rejected Tucker's idea of purchasing marihuana at the meeting in Arkansas preceding the Mexico trip. After the prosecutor questioned Mrs. Rusmisel on Tucker's suggestion to purchase marihuana and on the various individuals' reactions to the idea, cross-examination proceeded as follows:

Q. The group used marijuana, didn't it?

A. The group used marijuana? I can't speak for the group, only for myself.

Q. And you have used it?

A. I have used marijuana.

Q. And individual members of the group, to your knowledge, in your presence have used marijuana?

A. Yes.

Q. And collectively at various times different members of that group in the presence of other members from time to time, but in your presence, did use marijuana?

A. Not at the time these people were there, because my husband at this time, we were going to scientology, and it is the teaching of scientology that drugs of any kind, even aspirin, are not to be

used. We were not using marijuana when the Tuckers and the Hales moved to Eureka Springs.

Q. Mrs. Rusmisel, were you making an effort in studying scientology to remove yourself from drugs?

A. No.

Q. So it was not your intention to remove yourself from drugs?

A. I did not have to remove myself from drugs.

Q. Had you been using marijuana?

A. I had used it.

Q. Had you been using LSD?

A. I had used it maybe two years ago.

Q. Mescaline?

A. I have once.

Q. In fact, Bob Hale made about three trips to California to acquire mescaline and LSD, did he not?

A. I have no idea.

Q. There was a supply of it present in Eureka Springs and Fayetteville, was there not?

A. No, there was not, ever. There are no drugs in Eureka Springs at all, it is not a drug culture.

Q. Where was it that you smoked the marijuana, partook of LSD and had mescaline?

A. In Dallas, Texas.

Q. So you never had any after you left Dallas?

A. No, I have had it after Dallas.

Q. Where else?

A. In Austin.

Q. But you never had it in Arkansas?

A. Never in Eureka Springs.

Q. How about Fayetteville?

A. I don't think. I have only had it twice—

The court: He asked you if you had ever used drugs in Fayetteville.

A. No.

Q. Now, let's get outside of Eureka Springs. What you might be thinking of is Eureka Springs proper. In the area of Eureka Springs and the State of Arkansas, have you used marijuana?

A. When we lived in El Dorado, Arkansas, I used it.

Q. It is not fair to say that you concluded all of your drug use in Dallas?

A. No. But I would say that most of it was there, because that's where it was. It would be very hard if you wanted to use drugs to find it in the place we were living in. We are not living in that kind of culture.

Q. But you used it in El Dorado?

A. Yes, two years ago.

Q. So we do not give the jury the wrong impression, are you saying to the jury it has been two years?

A. No, I am giving you reference to locations and the time that I used drugs. I am not saying it is two years.

Q. When was the last time that you used drugs?

A. It is so strange, I can't exactly remember the last time.

Q. In your best recollection, when was the last time you used drugs, and that includes mescaline, LSD, marijuana, speed, methadrine or whatever.[13]

\*  \*  \*  \*  \*  \*

A. The last time I used drugs was Little Rock, Arkansas.

Q. When was that, in your best recollection, please, Ma'am?

A. My best recollection is being on a trip through there at some friends house.

\*  \*  \*  \*  \*  \*

A. I think it was Thanksgiving.

Q. Of what year?

A. Of this year.

Q. 1970?

A. Yes.

Q. What month is this?

A. This is June.

Q. Could you have made a mistake, was that '69?

---

**13.** It was at this point that the defense attorney objected to the inclusion of drugs which had not been mentioned in prior testimony. The court overruled the objection, and Rusmisel's attorney took exception to the court's ruling.

A. I'm sorry, '69.

Q. So you are saying now that the last time that you used any drugs was in the late months of 1969 around Thanksgiving?

A. Yes.

Q. Since it is obvious that you are classifying them, drugs of any type, when was the last time that you used any?

Mr. Rocha: I think she has already answered that, Your Honor. She said November of '69.

The Court: Answer the question. You told us the last time you remember smoking marijuana was about Thanksgiving of last year. He is now asking you about LSD.

Mr. Dimmitt: And since the reply may come by particular category, I am asking as to drugs, inclusive.

A. I'm sorry, Sir. You mean any drugs? Other than the date I have given you, is that the answer you want?

Q. Your best recollection, Ma'am, as to your last use of any of the drugs that you have testified that you have used from time to time.

A. Thanksgiving of 1969.[14]

Q. And that was the last of any drugs?

A. Yes.

Q. And with reference to others within the West Mountain Family in your presence, when was the last time you observed or saw any one of those persons using drugs?

A. I suppose that would be my husband and that was the last time I saw him using drugs.

Q. Back around Thanksgiving of 1969?

A. Yes.

* * * * * *

Q. Now, Bob Hale had used drugs in your presence, had he not?

A. I believe when we were living in Dallas then he did.

Q. Your husband had, as you have already stated, used drugs in your presence?

A. Yes.

Q. Milko Lasily had used drugs in your presence?

A. Yes.

Q. By drugs, I mean smoking marijuana?

A. Yes, I understand.

Q. Lane Lindley had used drugs in your presence?

A. Yes, Sir.

Q. And the various other members that I have not named, including Felix Tucker, Rosemary Tucker and the other lady?

A. No.

Q. In association—

A. No, Susan Hale has not used it.

Q. Exclusive of Susan, the rest of the West Mountain Family were using drugs?

A. In the past before the West Mountain Family, I had seen them use drugs.

Q. So what you are saying, as a group sitting together as West Mountain Family, you had never seen them all at the same time using drugs?

Mr. Rocha: Your Honor, I think she answered the question.

Mr. Dimmitt: I would like to have that clarified.

The Court: Would you answer that, please?

A. (No response)

Q. You had seen each of the members of West Mountain Family exclusive of Susan using drugs?

A. Before, yes.

Q. And on more than one occasion?

A. I can't say that for sure about everyone.

Q. You had been using drugs in conjunction with them?

A. Sir?

14. The district court aptly noted that "[t]he government became so enamored of the point that it later recalled Janet Hatchet as a rebuttal witness for the primary purpose of establishing that Mrs. Rusmisel had indeed smoked marijuana sometime between November, 1969 and March, 1970."

Q. You have been using drugs at the time that other members were, but not all together?

A. Yes, but not as members of West Mountain Family. My confusion here, the questions are asked about the time we were doing that. After we were West Mountain Family, we used to go to school together and take the drugs together.

A little later during the prosecutor's cross-examination of Susan Rusmisel the judge admonished her:

The Court: Wait a minute, just relax. What these lawyers are really asking you about and are interested in is the *use of drugs,* because that is what your husband and this other young man are *charged with* here.

(emphasis added.)

The prosecutor's cross-examination of Mrs. Rusmisel and the judge's admonition are illustrative of how the entire focus of the trial had become distorted. Obviously, the defendants were not charged with the use of drugs, although the testimony at the trial so indicated. Perhaps one final example of testimony on the personal use of drugs is worth citing. On direct examination defendant Lasily had testified to the fact that the sole purpose of the Mexico trip was to purchase leather, that he had not discussed purchasing marihuana with Felix Tucker before their departure, that Tucker bought marihuana from two men in Guadalajara, that he (Lasily) overheard Rusmisel warn Tucker not to take the marihuana across the border, that Rosemary Tucker had threatened that she would do anything to keep her husband out of jail, and that he (Lasily) had never discussed buying any marihuana with Janet Hatchet. On cross-examination, after briefly questioning Lasily about the purpose of the trip, the prosecutor launched into a string of questions on personal usage of marihuana:

Q. Did you ever discuss with Janet Hatchet, the girl you saw on the stand here, while she was living with you, a prospective trip to Mexico?

A. Yes, I discussed going to Mexico.

Q. Did you do this while you and she were both smoking marijuana?

A. Say that again.

Q. Did you smoke marijuana?

A. Do I smoke marijuana?

Q. Yes.

A. Now?

Q. Yes, Sir.

A. No.

Q. Did you then?

A. Yes, Sir.

Q. At the time you were living with Janet Hatchet and with Lane Lindley?

A. Occasionally.

Q. Occasionally?

A. That's right.

Q. During one of those occasions, do you recall talking about the trip to Mexico with her?

A. I might have said a few times I was going to Mexico and I was glad to go.

Q. You were also smoking marijuana at that time?

A. Occasionally.

Q. All right, Sir. Now, among the members of West Mountain Family, they, too, were smoking marijuana?

A. I don't know. I wasn't living with the whole family.

Q. You were not living with the whole family?

A. No.

Q. Janet Hatchet was smoking even though she wasn't a principal in the family, she was smoking with you?

A. Occasionally.

Q. Lane Lindley, you heard him testify in your behalf, he was smoking?

A. That's right.

Q. Susan Rusmisel who says that she hasn't had it since Thanksgiving 1969, you know that she was smoking marijuana?

A. No, I don't.

Q. You do not?

A. No, I wasn't living with her.

\* \* \* \* \* \*

Q. At any time during the meetings or shortly after the meetings, scientology,

business, dinner or discussion about the business in general, at any of those times when all of them were together, was there a discussion about marijuana?

A. No.

Q. At any time did you partake of any marijuana, smoke marijuana in the presence of others?

A. There was never no marijuana when I was present.

Q. None while you were present?

A. No.

Q. The only time you had it was when you and Janet Hatchet and Lane Lindley were at home?

A. That's right.

■ At the section 2255 hearing petitioner Rusmisel testified that on numerous occasions during his trial he wrote messages to his attorney in large letters and punctuated with exclamation marks, to "object" or "please object," but that his attorney did not respond. Rusmisel also testified that at the conclusion of the first day of trial he was very upset and asked his attorney why everything had "gotten so basically out of hand" and why "a truthful case was just totally sliding away from [them] in court." Rusmisel testified without contradiction, that when he voiced dissatisfaction, his attorney's response was that he had to continue working in the court and had to continue living in the community after Rusmisel's case was concluded. Rusmisel further testified that this statement from his attorney came in response to concerns Rusmisel had expressed in regard to the judge's "admitting testimony that seemed to be favorable to the prosecution and not so to the defense." Additionally, Rusmisel testified without contradiction that the prosecutor in his closing argument characterized him as a cult leader [15] and that the prosecutor described the West Mountain Family as a communist communal group possibly involved in the Zudo religious cult or in witchcraft. The defense attorney, however, failed to object to the prosecutor's closing argument and to perfect the point on appeal.[16]

■ This Court concludes that defense counsel's failure to object to the prosecution's introduction of evidence of personal usage of drugs by defendants, failure to object to the prosecution's attempt to prove guilt by association with drug users, and failure to object to the inflammatory remarks the prosecution made in closing argument rendered petitioner Rusmisel's trial fundamentally unfair.[17] This conclusion is

---

**15.** The Charles Manson trial was underway at the time of petitioner's trial.

**16.** The Government argues that the best evidence rule precludes introduction of petitioner's testimony concerning the contents of the prosecutor's closing argument. In its brief the Government states:

It is submitted that the "uncontradicted testimony" of the petitioner is not competent proof of what transpired in open court during a trial in a court of record. This is to be proven only by the record itself, unless it is established that the record does not exist or cannot be obtained, Rules 1002, 1004, 1005, F.R. Evidence.

(footnote omitted.)

In a § 2255 proceeding, however, the petitioner may introduce evidence *dehors* the record to support a claim of ineffective assistance of counsel. *United States v. Brown,* 476 F.2d 933, 935, D.C.Cir. (1973); *United States v. Goodwin,* 446 F.2d 894, 895, 9th Cir. (1971). Furthermore, the best evidence rule is not applicable here as petitioner is attempting to prove the content of the closing argument—not the contents of a writing.

**17.** The Government's allegation that the district court applied an incorrect standard of law in ruling that Rusmisel was prejudiced by the defense attorney's failure to object to the inflammatory evidence is without merit. The district court clearly stated that even under the *United States v. Frady* standard petitioner had carried his burden of demonstrating that "the outcome of this trial was materially and substantially affected by the quality of the representation actually rendered to petitioner." In *Washington v. Strickland,* 693 F.2d at 1258, this Court adopted the "actual and substantial prejudice" standard of *Frady* for ineffective assistance cases: "[T]he petitioner has the burden of persuasion to demonstrate that the ineffective assistance created not only 'a *possibility* of prejudice, but that [it] worked to his *actual and substantial disadvantage,*" *citing United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original).

reinforced by the fact that the evidence at trial consisted of a classic swearing match, and that while there was sufficient evidence upon which to convict Rusmisel, the evidence was certainly less than overwhelming.

The district court's grant of petitioner's section 2255 motion is affirmed.

AFFIRMED.