

# NUMBER 13-23-00110-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

AMY ELIZABETH ODEM,                                                      Appellant,

v.

THE STATE OF TEXAS,                                                       Appellee.

### On appeal from the 36th District Court
### of Aransas County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellant Amy Elizabeth Odem appeals her convictions for three counts of injury to a child, a second-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(a). Appellant received three sentences of fifteen years' confinement to run concurrently. By two issues, appellant contends that (1) the evidence is insufficient to support the convictions and (2) her trial counsel rendered ineffective assistance. We affirm.

## I.     SUFFICIENCY OF THE EVIDENCE

The grand jury indicted appellant for three counts of injury to a child. The three counts in the indictment were identical except for the dates of the alleged offenses: Count 1 allegedly occurred "on or about December 2019"; Count 2 allegedly occurred "on or about December 2020"; and Count 3 allegedly occurred "on or about March 2021." Specifically, the indictment accused appellant of recklessly causing "serious bodily injury or serious mental deficiency, impairment, or injury to [the complainant], a child younger than 14 years of age . . . by taking [the complainant] to be in contact with Ralph Hubbard and leaving [the complainant] alone with [Hubbard] after being informed that [Hubbard] was acting sexually inappropriate with [the complainant]. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (2), (c)(1). Hubbard previously pleaded guilty to continuous sexual abuse of the complainant.

By her first issue, appellant contends that the evidence is insufficient to support her conviction. Specifically, appellant argues as follows:

> [T]he State failed to prove that [appellant] committed injury to her child by acting recklessly as stated in the indictment because (1) no evidence showed that she acted unreasonable or reckless as a parent, or (2) that she knew about . . . [Hubbard's] predatory nature prior to his arrest, and (3) she relied on a CPS [child protective services] investigation that indicated no wrongdoing on her part.

### A.     The Evidence

The complainant's father J.W. testified that, after breaking up with appellant in 2013, he moved from Texas to Florida, and eventually married his current wife and the complainant's stepmother, N.W., in 2018.[1] Appellant and the complainant continued

---

[1] To protect the identity of the alleged child victim, we will refer to her as "the complainant" and to

2

living in Texas.

According to J.W., during the Thanksgiving holidays in 2019, the complainant visited the couple in Florida, and N.W. inspected the complainant's phone. J.W. stated that, after N.W. inspected the phone and found concerning text messages, she contacted CPS, and CPS then investigated concerns about a relationship Hubbard, appellant's friend, had with the complainant. J.W. informed appellant of the concerns in a phone conversation. According to J.W., the concern stemmed from "[s]ome very vulgar conversations between [Hubbard,] a grown man, and [the complainant,] a young child."

On redirect examination, the State asked J.W. to describe the text messages between Hubbard and the complainant. J.W. said, "There was a text message that said if sucking . . . such and such was a sport, this would be you, and then it had a person in a room full of trophies . . . ."[2] According to J.W., there were other messages, "plus many pictures of [Hubbard] and [the complainant] at a bar with her hands around an alcoholic

---

her relatives by their initials. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (citing TEX. R. APP. P. 9.8 cmt.).

[2] J.W. did not further explain what the text messages said. However, Erica Gerstenberger, a former CPS unit supervisor familiar with the CPS investigation, testified about the text messages as follows:

[The complainant] sent a meme of a man standing in front of trophies. Let's see. Yes. "This is you if sucking dick were a sport" with the caption.

In return [Hubbard] replied with a meme . . . by saying, "Study for your exam and get a good grade."

He also said that he missed her in text messages. And the dog's penis was hard and visible in a picture and then [Hubbard] texted that he is waiting for you.

Gastenburger stated that "there was a concern that [the complainant] had been sexually abused"; however, the complainant failed to make an outcry at the CPS interview. When the State asked if appellant was informed that Hubbard and the complainant had been discussing "oral sex" and about the specific text messages, Granstenberger replied, "Yes." Gastenberger testified that CPS informed appellant that although she is not prohibited from allowing Hubbard continued access to the complainant, if in the future he sexually abused her, "then [CPS] will hold [appellant] accountable for it, because you were well aware of the concern whenever we conducted our investigation."

beverage together. I mean she was 11 years old at the time." J.W. stated that all the text messages had been reported to CPS.

J.W. testified that, when he informed appellant of the concerns, he did not "believe there was much of a response from her about it. It was nothing concerning [to her]." J.W. stated that, after the CPS investigation, CPS informed him that he and N.W. had "[taken] things out of context."

Subsequently, in April 2021 "full custody, primary custody" of the complainant was given to J.W., and the custody court also issued "a no-contact order between [the complainant and] . . . Hubbard." J.W. explained that the order disallowed either parent from allowing Hubbard to have contact with the complainant. The complainant then moved to Florida to live with J.W. in April 2021. During the Christmas vacation in 2021, the complainant visited appellant in Texas.

On cross-examination, appellant asked J.W. if he thought that appellant "knew of this sexual inappropriateness the whole time," and he responded, "[Y]es, I do believe she did." J.W. acknowledged that the complainant "did not make any outcries" during the CPS investigation in 2019. On redirect examination, J.W. testified that while in appellant's care, the complainant "stayed with [Hubbard] a lot, and he took care of her a lot."

The complainant, a fourteen year old child, testified that appellant is her mother and that Hubbard, her former neighbor, had sexually assaulted her on numerous occasions too frequent to count, beginning when she was approximately six years of age. The complainant was unable to count how many times that Hubbard was around her while he was naked.

The complainant stated that she eventually told appellant that Hubbard was touching her "in inappropriate places," including her "chest area and [her] butt," and that she did not like it. According to the complainant, appellant told her that she was "overreacting . . . and got mad at [the complainant]." The complainant stated that after she told appellant that Hubbard was touching her inappropriately, appellant continued to allow Hubbard to be alone with the complainant, and Hubbard continued to be "sexually inappropriate" with her. The complainant testified that "maybe a month or two" later she again told appellant that Hubbard was "still touching [her] in inappropriate places [and that she didn't] like it." According to the complainant, she told appellant the specific areas of her body that Hubbard had been touching, and appellant "got mad" "and [told the complainant] not to bring it up again." The complainant stated that appellant continued to allow Hubbard to be alone with the complainant, and the abuse continued. The complainant said that she never told her father because she did not believe it was a "big deal" because appellant "said it wasn't . . . ."

The complainant testified that she visited her father for Thanksgiving in Florida, and she had a cell phone that her stepmother examined. When the complainant returned to Texas, an investigation by CPS ensued. According to the complainant, appellant drove her to an interview with CPS, and appellant "told [her] not to talk about [Hubbard], [appellant], or [appellant's husband] Harold [Odem]." Therefore, according to the complainant, she did not tell the interviewer about Hubbard. The complainant testified that, after the CPS interview, appellant continued to allow Hubbard to be alone with her, and Hubbard continued to sexually abuse her.

5

The complainant eventually moved to Florida, and in 2021, she returned to Texas to visit her mother for Christmas. During that visit, appellant informed her that Hubbard would be visiting her, and she was able to see Hubbard because "[h]e drove to [appellant's] new RV park, and he gave [her] a present."

After the Christmas visit, the complainant returned to Florida, and she eventually made an outcry about Hubbard's abuse. The complainant stated that she finally made the outcry because she "felt safer" because she "knew that [appellant] couldn't do anything and [Hubbard] couldn't do anything, and [she] just felt really comfortable at the time."

The complainant testified that she has been in treatment with a counselor "[f]or over a year," which the complainant agreed was "actually helping." The complainant stated that she has been diagnosed with depression and is taking antidepressants; she has "trouble" sleeping "every other day"; she has "issues with anxiety" in that she "always [has] anxiety with being in a group,"; she has had five or six panic attacks, with the last one occurring "[a] few weeks" prior to her testimony; she had a "mental breakdown" about one week prior to her testimony; and she has them "[l]ike once a month maybe, every other month." The complainant explained that when she has a mental breakdown, she "start[s] crying and shaking and [she] can't breathe."

N.W. testified that the complainant has been diagnosed with post-traumatic stress disorder (PTSD) and attention deficit disorder. According to N.W., the complainant has three different forms of depression and "a parental withdrawal type of depression." N.W. explained that the complainant has had physical manifestations of her mental disorders in that she cannot calm down and cries uncontrollably. On one occasion, the complainant

6

was crying uncontrollably and was unable to calm down, so N.W. put her to bed. However, the next morning, the complainant had no recollection that this had transpired. These instances "happened at least three to four times." N.W. relayed that on another occasion, the complainant woke up screaming, complaining that she had a nightmare that she was back in Rockport, and she wanted to be held because "she just needed to feel safe for a minute." N.W. was unable to "describe all of the different instances that she has just had a complete panic attack, a meltdown." N.W. testified that the complainant had been on medication for her disorders. At the time of trial, the complainant was still in counseling, and her last panic attack had occurred the Wednesday prior to the trial. N.W. agreed that it is "fair to say that even to this day, [the complainant] still has some serious mental and emotional things that she is working through?"[3]

Hubbard testified that, at the time of trial, he was serving a prison sentence after being convicted of sexually abusing the complainant. Hubbard acknowledged that he pleaded guilty to "certain acts of sexual abuse against" the complainant in September of

---

[3] N.W. explained that when she inspected the complainant's cell phone she observed the following:

Puggie was [Hubbard's] dog—was in his lap. The dog's penis was hanging out, and [the text] was saying that we were missing you and ready for you to be home.

I come across . . . like a meme of Bill Clinton, and he has got a coffee with like this sarcastic face and he says, "We sure do miss you."

I come across . . . another meme, that is a wall of trophies. And it said, "If sucking dick were a sport, this would be you."

And underneath it was a baby meme holding a fist where [Hubbard] had told her that she better study so she can get a good grade on her exam.

N.W. told appellant, "[T]here is no reason for a sixty-year old man to be talking about sucking dick with a ten-year-old child. I don't care if it's a friend or not," and appellant replied, "[O]h, she is just trying to find herself."

2022. State's Exhibits 2, 3, and 4, the judgments of conviction, show that Hubbard pleaded guilty to continuous sexual abuse of a child under fourteen and two counts of indecency with a child by exposure. Specifically, according to State's Exhibit 1, Hubbard was indicted for continuous sexual abuse of the complainant by committing indecency with a child by sexual contact, in that he engaged in sexual contact with the complainant by causing her to touch his genitals with the intent to arouse or gratify his sexual desires and he committed indecency with a child by exposure by exposing his genitals to her when she was younger than seventeen years' of age with the intent to gratify his sexual desires.[4]

Hubbard stated that appellant allowed him to be alone with the complainant for years starting from when she was approximately seven years old. According to Hubbard, he took the complainant to and from school, he bought food for her, he fed her "at least five days a week," he "spent a lot of money on" her, he bought shoes and computer tablets for her, he purchased an iPhone 11 Pro for her, he paid her cell bill, and he transported her to and from a theatre program. He also testified that he gave appellant money.

When the State asked Hubbard if appellant had seen him and the complainant naked together, he responded that he was not sure. However, according to Hubbard, when the complainant was around eight or ten, appellant "got close" to seeing that the pair were naked multiple times. The first incident occurred when the complainant and Hubbard were at the beach. Hubbard explained, "Me and [the complainant] had our bathing suits on our bed, and [appellant] left and I didn't know she came back, and we[']re

---

[4] The indictment is redacted, and we are unable to read it fully.

out there [in the water]. You know, what else are you wearing besides your bathing suit?"

Another incident involved the complainant at Hubbard's home. Appellant opened the door to his home without knocking, which Hubbard explained was unusual. He testified that he came downstairs from taking a shower: "I'm coming down. . . . I'm wet. She [appellant] didn't ask what is [the complainant] doing up there; nothing else." The State asked, "So as you are coming out of the shower where is [the complainant]?" Hubbard replied, "Up there with me."

Lastly, the State asked Hubbard if he recalled telling a police investigator that appellant saw him skinny dipping with the complainant. Hubbard explained, "Well, that's when we had our bathing suits on our head, but we didn't get out of the water." Hubbard said that the complainant had worn a t-shirt and trunks to the beach, and he had worn trunks; however, when appellant saw them, the complainant had her t-shirt and trunks on her head and Hubbard had his trunks on his head. Thus, they were naked in the water.

Hubbard testified that, after CPS investigated allegations that he had acted inappropriately with the complainant, appellant allowed Hubbard access to the complainant. Specifically, Hubbard saw the complainant approximately two weeks after CPS interviewed her. Hubbard stated that the complainant moved to Florida in March 2021, and she visited appellant in December 2021. According to Hubbard, appellant allowed him to visit the complainant, and he gave the complainant Christmas gifts, which were "hoodies," "a mask," and an "iPhone Apple watch."

Investigator Stephen Nanny testified that a detective from Florida contacted the Aransas County Sheriff's Office reporting that the complainant made an outcry that

9

Hubbard had sexually abused her in Aransas County. The Florida detective sent the forensic interview of the complainant occurring in 2022 to Investigator Nanny. Investigator Nanny initiated his own investigation into the allegations that Hubbard committed the offense of continuous sexual abuse of a child. Due to his investigation, Investigator Nanny acquired "flash drives containing child pornography" belonging to Hubbard.

On January 20, 2022, Investigator Nanny interviewed appellant, and she told him that she had received "small amounts" of money from Hubbard. Appellant informed Investigator Nanny that she had been aware of the CPS investigation in 2019 and "[t]hat there were sexual allegations made between [Hubbard] and [the complainant]." Appellant admitted to Investigator Nanny that, during the Christmas holidays in 2021, Hubbard saw the complainant when he "dropped off some hoodies for" her, and appellant acknowledged that she was aware of a court order prohibiting the complainant "from having contact with" Hubbard. The trial court admitted State's Exhibit 1A, which is the indictment against Hubbard, and State's Exhibits 2, 3, and 4, which are the judgments against Hubbard and "include some of the sexual acts [Hubbard] plead[ed] guilty to."

Mike Monahan, a criminal investigator with "US Homeland Security Investigations in Corpus Christi," Texas, testified that he inspected digital media belonging to Hubbard. Investigator Monahan found videos "produced on hidden camera devices." According to Investigator Monahan, he found a still picture with "markings on the photograph" indicating that the complainant was "eight years of age." The photograph was a "close-up" of "a child's vagina and anus nude exposed." Investigator Monahan testified that there were eight videos featuring Hubbard and the complainant, "with [the complainant]

10

touching Hubbard's penis or touching generally his genital area while Hubbard was either masturbating or naked." "There were another 143 of those secretly recorded videos featuring Hubbard completely nude and masturbating while he was seated on the sofa behind [the complainant] as she was playing video games and seated on the floor in front" of him. Investigator Monahan testified that

> [t]he reason why I [questioned appellant about receiving money from Hubbard] is because I had learned early on in the investigation when we were requested by the Aransas County Sheriff's Office to assist that there was some information, some belief, that . . . Hubbard had given [appellant] money and that also I believe the gifts had been . . . purchased for [appellant], and that set investigators to thinking that there might possibly have been child sex trafficking activity in this situation.

Appellant informed Investigator Monahan that she had received money from Hubbard "over the years." "She stated . . . that she received various amounts of money from [Hubbard], and [Hubbard] . . . advised that he had given her money over the years at different points."

## B.     Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). Direct and circumstantial evidence are equally probative. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given to their testimony. *Ghanem v. State*, No. 13-22-00447-CR, 2024 WL 116932, at *9 __,

11

S.W. 3d \_\_\_, \_\_ (Tex. App.—Corpus Christi–Edinburg Jan. 11, 2024, no pet. h.) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.)). We resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327 (quoting *Malik*, 953 S.W.2d at 240).

Consistent with the indictment, a hypothetically correct charge in this case would instruct the jury to find appellant guilty if she recklessly caused serious bodily injury or serious mental deficiency, impairment, or injury to the complainant who was then a child younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (2), (c)(1). "A person acts recklessly, or is reckless, with respect to . . . the result of her conduct when she is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

### C.    Analysis

The evidence showed that appellant was aware that her daughter was being

12

sexually abused by Hubbard. The complainant told appellant twice that Hubbard was sexually abusing her, and instead of calling the police on either occasion, appellant became angry and told the complainant not to repeat her allegations. In addition, appellant told the complainant not to talk about Hubbard when she was interviewed by CPS even though the complainant had told her about the sexual abuse. Nonetheless, the evidence also shows that appellant continued to allow Hubbard to be alone with the complainant, and Hubbard continued to sexually abuse her. Furthermore, Hubbard testified that appellant saw him coming out of the shower naked while the complainant was present. Finally, from the testimony, the jury could have inferred that the complainant suffered "serious mental deficiency, impairment, or injury" due to appellant's awareness of and apparent acquiescence to the sexual abuse by Hubbard, which caused the complainant to suffer PTSD. *See Ghanem*, ___, ___ ___ S.W. 3d at ___ ; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ("The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979))); *see also Franco v. State*, No. 13-14-00108-CR, 2016 WL 3389967, at \*7 (Tex. App.—Corpus Christi–Edinburg June 16, 2016, no pet.) (concluding that a rational trier of fact could have found from evidence that the child victim suffered from PTSD and the child's "mental deficiency, impairment or injury was caused by [the] appellant").

Therefore, we reject appellant's assertions that there is no evidence showing that she "acted unreasonable or reckless as a parent." *See* TEX. PENAL CODE ANN. 22.04. We

13

also reject appellant's claim that there is no evidence that she knew that Hubbard had a "predatory nature" or that "she relied on a CPS investigation that indicated no wrongdoing on her part."[5] Accordingly, we conclude that a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99. We overrule appellant's first issue.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

By her second issue, appellant contends that her trial counsel was ineffective because he failed to properly investigate her case, failed to present an expert witness on child witness testimony, and failed to present evidence that the complainant did not suffer from a serious mental impairment. Appellant does not specifically address the *Strickland* prongs in her brief.[6] *See* TEX. R. APP. P. 38.1(i); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984) (setting out the two-part test applicable to claims of ineffective

---

[5] Appellant does not elaborate.

[6] This is appellant's entire argument regarding ineffective assistance of counsel:

Appellant contends that she was denied a meaningful adversarial trial and/or effective counsel based on defense counsel's actions in failing to investigate her case, failing to present an expert witness on child witness testimony, and/or failing to present evidence showing child . . . did not suffer any serious mental impairment. The trial record shows no expert witnesses were called by defense counsel. Appellant also contends Defense counsel did not properly prepare her to testify on her own behalf. Third, Appellant argues that defense counsel's strategies were ill-chosen as to render her trial fundamentally unfair. *See United States v. Rusmisel*, 716 F.2d 301, 310 (5th Cir. 1983). She requested new counsel but was refused by the court. Hence, Appellant contends this action compromised the proper functioning of the adversarial process such that her trial cannot be said to have produced a reliable result. Therefore, her convictions should be overturned due to ineffective assistance of counsel or lack of an adversarial trial process.

Appellant merely makes several bald assertions in her brief regarding her trial counsel's alleged mistakes. She has not explained with citation to appropriate authority how these alleged acts amount to deficient performance. *See Thompson v. State*, 9 S.W.3d 808, 812, 813 (Tex. Crim. App. 1999) (providing that the burden is on appellant to show by a preponderance of the evidence that trial counsel's performance was deficient). Moreover, appellant does not explain how but for her trial counsel's alleged mistakes, there is a reasonable probability that she would have been acquitted of the offense. *See id.* at 812.

14

assistance of counsel).

Nonetheless, appellant's issue lacks merit. It is appellant's burden to prove counsel was ineffective by a preponderance of the evidence, and we review counsel's performance in the totality of the representation, not by isolated acts or omissions. *Thompson v. State*, 9 S.W.3d 808, 812, 813 (Tex. Crim. App. 1999). Appellant must overcome a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). We do not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). Therefore, an allegation of ineffectiveness must be "firmly founded in the record." *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim. App. 2002) (quoting *Thompson*, 9 S.W.3d at 813–14).

Here, the record is silent regarding trial counsel's reason for failing to do the complained-of acts. Moreover, there is nothing in the record indicating that trial counsel failed to conduct a proper investigation. Therefore, appellant has not overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance and that trial counsel's actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. Finally, without more, we are unable to conclude that appellant has met her burden to prove that, but for trial counsel's alleged failure to present an expert witness on child witness testimony and failure to present evidence that the complainant did not suffer from a serious mental impairment, there is a

15

reasonable probability that appellant would have been acquitted of the offenses. *See*

*Thompson*, 9 S.W.3d at 812; *see also Strickland*, 466 U.S. at 694. We overrule appellant's

second issue.

### III. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
15th day of February, 2024.