James NEALY, Petitioner-Appellant,

v.

Donald A. CABANA, Superintendent of Mississippi State Penitentiary, Respondent-Appellee.

No. 83-4274.

United States Court of Appeals, Fifth Circuit.

July 12, 1985.

Wendell Hobdy Bryan, II, (Court-appointed), Amory, Miss., for petitioner-appellant.

Wm. A. Allain, Atty. Gen., Bill Patterson, Robert L. Gibbs, Asst. Attys. Gen., Jackson, Miss., for respondent-appellee.

Before RUBIN, WILLIAMS, and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

James Nealy appeals from his conviction and life sentence for the murder of Leo Davis. Nealy contends that his trial attorney failed to secure the testimony of three persons whose testimony might have established an alibi for him, thereby depriving him of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. Because the trial boiled down to a swearing match between a prosecution witness, who admitted committing the crime, and Nealy, who denied any part in it, and because the missing testimony might have affected the jury's appraisal of the truthfulness of the state's witness and its evaluation of the relative credibility of the conflicting witnesses, Nealy has stated a claim for ineffective assistance of counsel. We, therefore, reverse the decision of the district court denying Nealy's petition for writ of habeas corpus and remand for entry of an order granting him a new trial.

I.

Leo Davis was murdered in his grocery store located in Clay County, Mississippi, in 1976. A post-mortem examination revealed that he had been stabbed a number of times, slashed across his throat, and struck on his head and jaw with a blunt instrument. The examining physician concluded that any one of these injuries would have caused Davis' death.

After the police discovered Davis' body, they arrested Wiley Ewing and charged him with Davis' murder. Ewing confessed

to the killing, and assisted the police in recovering a pair of gloves, a knife, and a sawed-off shotgun used in the murder. Ewing also admitted taking some money from Davis' cash register and two $100 bills from his billfold. Ewing stated that he had travelled to and from Davis' store in a car borrowed from Nealy, and that he had hidden the $100 bills in the hubcaps of Nealy's car. Nealy was present when Ewing was arrested. He allowed the police to search his car, and two $100 bills were found inside a hubcap. Ewing did not implicate anyone else in the crime, and Nealy was not arrested at this time.

Several days later, however, after conferring with his attorney, Ewing gave a statement to the police in which he again confessed to the crime, but in addition, implicated both Nealy and T.L. Cunningham. According to Ewing, the three men had visited the home of Dorothy Belk where they stayed for five to fifteen minutes. From there, they set out in Nealy's car, and, after beginning their ride, decided to rob Davis' store. They parked approximately a quarter-mile from the store and walked to it, arriving between 8:00 and 9:00 p.m. Cunningham entered the store first in order to distract Davis. Ewing and Nealy then came in, and Nealy struck Davis across the face with the shotgun. After Davis fell to the floor, Ewing began to stab him, and, in the course of the melee, Nealy again struck Davis with the gun, Cunningham kicked him, and Ewing cut his throat.

After the men returned to Nealy's car, Ewing asserted, they drove to a country store and pool hall operated by Tom Bill Avant, arriving between 8:30 and 9:00. No other customers were there. The three men shot pool and left at approximately 9:30. After Ewing drove Cunningham and Nealy home, he borrowed the car from Nealy and drove himself home.

At trial, Ewing appeared for the prosecution and repeated his version of the facts. In addition, Tom Bill Avant, testifying for the state, related that he saw Nealy, Cunningham, and Ewing shooting pool at his

place around 9:00 p.m. He further testified that two of the three pool tables were busy when the three men arrived, but he could not remember any of the other customers.

The state also called Mary Sanders, Davis' landlady and next door neighbor. She explained that her home was "within hollering distance" of Davis' store, and in addition, that a microphone located in the store transmitted to a speaker in her home. On the night of the murder, she said, she heard voices in the store between 8:00 and 9:00 p.m. and saw a car leaving the store around 8:00. On cross-examination, however, she added that her "talker" was on "real low" that night, and that her television was on extremely loud "to where you could hear it on the road." Therefore, she could not recognize the number of voices she heard on her loudspeaker or their identity. She also said that she went to bed at 9:00 that evening and did not hear any other voices or cars at the store that night.

Nealy testified on his own behalf. He claimed that the three men (Ewing, Cunningham, and he) went to Dorothy Belk's home shortly after 8:00 p.m. and stayed for fifteen or thirty minutes. They left about 8:30 and went to Avant's pool hall, arriving at approximately 9:00. He testified that other people were at Avant's when he arrived, including Richard and "Duck" Jones. He stated that the three men and the two Jones brothers left together shortly after 9:20, and that, after he drove Cunningham and the Joneses home, he drove himself home and lent Ewing his car. He denied complicity in the crime.

The jury convicted Nealy of the murder of Leo Davis and sentenced him to life imprisonment. His conviction was affirmed on direct appeal.[1] After exhausting all available state remedies, Nealy sought federal habeas corpus relief on the ground that he was denied effective assistance of counsel when his attorney, Richard Burdine, failed to investigate and secure the

---

**1.** *Nealy v. Mississippi,* 354 So.2d 788 (Miss.1978).

testimony of Dorthy Belk (otherwise known as Dorthy Cummings) and the Jones brothers.

A U.S. Magistrate held an evidentiary hearing on this claim. He found that Burdine was aware that Belk was a potential alibi witness because Nealy contended that he was at her house with Ewing and Cunningham at approximately the time Ewing stated the murder took place. Moreover, Burdine knew Belk personally because they had worked together in the same legal services office. Nonetheless, Belk did not testify at Nealy's trial because Burdine was unable to communicate with her. Burdine spoke with Belk's grandmother who supplied him with a telephone number for Belk in Wisconsin. He tried to call her there, and left messages for her to return the calls. He made no effort, however, to discover her address or to secure her attendance at trial. Burdine also made no attempt to obtain her presence through the use of the Uniform Witness Attendance Law.[2]

The Magistrate further found that Nealy had told Burdine about the Jones brothers because Burdine's line of questioning at trial strongly indicated that he was aware that the brothers could corroborate at least a portion of Nealy's version of the facts. Burdine testified that he had made no effort to reach the Joneses, claiming at the evidentiary hearing that he did not remember Nealy telling him about them.

Belk appeared at the hearing before the Magistrate. She testified that she met Ewing, Nealy, and Cunningham at a neighbor's house "around 6:00 or maybe 6:30" and left them at her house "around 7:00, or it could have been 7:30." On cross-examination, she said that she left her home "probably around 8:00." Later, she said that she left her house "between 7:30 and 8:00."

The Jones brothers also testified at the evidentiary hearing. They both remembered seeing Nealy, Ewing and Cunningham at Avant's place, and catching a ride home with them. Neither could remember with certainty whether this occurred on the night of the murder, but both thought that their memories might have been more clear if they had been questioned earlier.

## II.

The Magistrate concluded that, even if Burdine's failure both to take more vigorous steps to interview Belk and to interview the Jones brothers constituted incompetent representation, Nealy was not prejudiced by these failures. Burdine's conduct, therefore, did not constitute ineffective assistance of counsel in derogation of the sixth amendment. The district court expressly adopted these findings.

The scope of our review is governed by *Strickland v. Washington*.[3] In *Strickland*, the Supreme Court noted that "although District Court findings are subject to the clearly erroneous standard of Fed. Rules Civ.Proc. 52(a) . . . the ineffectiveness inquiry [involves] mixed questions of law and fact."[4] This is consistent with a long line of Fifth Circuit cases holding that whether a defendant has received effective assistance of counsel is a mixed question of fact and law rather than purely a question of fact.[5]

"This Court must," therefore, "make an independent evaluation based on those subsidiary findings in determining whether counsel's representation satisfied the standards dictated by the sixth and fourteenth amendments."[6] We are required to make our own determination whether Burdine's

---

2. Codified in Mississippi as Miss. Code Ann. §§ 99–9–27 *et seq.* (1972).

3. —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

4. *Id.* at ——, 104 S.Ct. at 2070.

5. *United States v. Rusmisel*, 716 F.2d 301, 304 (5th Cir.1983); *Washington v. Watkins*, 655 F.2d 1346, 1352 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982) and cases cited therein.

6. *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir.1983). *See Washington v. Watkins, supra,* 655 F.2d at 1354.

representation passes constitutional muster,[7] and do not defer to the district court's conclusion.

### III.

In *Strickland*, the Supreme Court enunciated the two-component standard to be applied when reviewing a claim of ineffective assistance of counsel. The Court held:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[8]

The Court stressed that the purpose of the constitutional requirement of effective assistance is "to ensure a fair trial," and that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result."[9]

#### A. *Burdine's performance*

■ "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[10] Our inquiry into the adequacy of Burdine's performance, therefore, must focus on "whether counsel's assistance was reasonable considering all the circumstances."[11] Nealy argues that Burdine failed in his duty to investigate. To determine the reasonableness of Burdine's conduct in this situation, we must take into account two different, and potentially antithetical, considerations. First is the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[12] Because of the danger of over-zealous post-trial inquiry into an attorney's decisions made during the litigation, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[13]

■ A substantial body of Fifth Circuit case law insists, however, "that 'effective counsel conduct a reasonable amount of pretrial investigation.'"[14] Although the scope of the required investigation is a function of the "number of issues in the case, the relative complexity of those issues, the strength of the government's case and the overall strategy of trial counsel,"[15] this circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case.[16] This duty is reflected in the American Bar Association

---

7. *Mattheson v. King,* 751 F.2d 1432, 1438 (5th Cir.1985); *Ricalday v. Procunier,* 736 F.2d 203, 206 (5th Cir.1984).

8. — U.S. at —, 104 S.Ct. at 2064. *Accord Schwander v. Blackburn,* 750 F.2d 494, 502 (5th Cir.1985); *Avery v. Procunier,* 750 F.2d 444, 447 (5th Cir.1985); *Celestine v. Blackburn,* 750 F.2d 353, 356 (5th Cir.1984).

9. *Strickland, supra,* — U.S. at —, 104 S.Ct. at 2064.

10. *Id.* at —, 104 S.Ct. at 2065.

11. *Id.*

12. *Id.* at —, 104 S.Ct. at 2066.

13. *Id.*

14. *Martin v. Maggio,* 711 F.2d 1273, 1280 (5th Cir.1980), quoting, *Washington v. Strickland,* 693 F.2d 1243, 1251 (5th Cir.1982) (en banc), *rev'd on other grounds,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Kennedy v. Maggio,* 725 F.2d 269, 272 (5th Cir.1984).

15. *Martin, supra,* 711 F.2d at 1280; *Baldwin v. Maggio,* 704 F.2d 1325, 1333 (5th Cir.1983).

16. *Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982); *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979).

Standards for Criminal Justice,[17] a proper guide for determining what is reasonable under the circumstances.[18] These specific obligations inherent in counsel's duty to investigate must temper the amount of deference we give Burdine's on-the-spot actions in evaluating his performance.

■ Burdine admittedly made no attempt whatsoever to interview the Jones brothers. Although he tried to telephone Belk in Wisconsin, he made no other efforts to discover her address or to secure her attendance at trial. He also made no attempt to compel Belk's attendance at trial through the use of the Uniform Witness Attendance Law in effect in both Mississippi and Wisconsin. Nealy has thus identified specific omissions of counsel that are alleged not to have been the result of reasonable professional judgment.[19]

"Defense counsel is not required," we have said, " 'to investigate everyone whose name happens to be mentioned by the defendant.' "[20] In all of the cases in which this axiom has been applied, however, the court found either that counsel's decision not to investigate was part of a clearly developed defensive strategy, or that the defendant could point to no specific evidence that would have been uncovered by a more thorough investigation.[21]

Here, however, Nealy has identified specific missing testimony, and has argued that there was no reason for Burdine not to have at least attempted to locate the Jones brothers or to contact Belk. Burdine did not testify that such efforts would have been fruitless, nor did he claim that the decision not to investigate was part of a calculated trial strategy. He simply failed to make the effort to investigate. Burdine, therefore, "did not *choose*, strategically or otherwise, to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's cause."[22] Burdine's failure to investigate thus resulted in a "factual vacuum" and cannot withstand sixth amendment scrutiny.[23]

### B. *Prejudice*

■ In *Strickland,* the Supreme Court articulated "the appropriate test for prejudice" as follows: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different."[24] "A reasonable probability," in turn, was defined as, "a probability sufficient to undermine confidence in the outcome."[25] "[A] defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome of the case."[26] The Court found this "outcome-determinative" standard imposed too heavy a burden on defendants, and that its use was not appropriate.[27] Instead, "the question is whether there is a reasonable probability that, absent the errors, the

---

**17.** American Bar Association Standards for Criminal Justice 4–4.11 (2d ed. 1980) ("The Defense Function").

**18.** *Strickland, supra,* —— U.S. at ——, 104 S.Ct. at 2065.

**19.** *Strickland, supra,* —— U.S. at ——, 104 S.Ct. at 2066.

**20.** *Schwander v. Blackburn,* 750 F.2d 494, 500 (5th Cir.1985), quoting, *United States v. Cockrell,* 720 F.2d 1423, 1428 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). *See also Gray v. Lucas,* 677 F.2d 1086, 1093 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983).

**21.** *See, e.g., Murray v. Maggio,* 736 F.2d 279, 282 (5th Cir.1984); *Larsen v. Maggio,* 736 F.2d 215,

218 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 598, 83 L.Ed.2d 707 (1984); *United States v. Cockrell, supra,* 720 F.2d at 1428–29.

**22.** *Washington v. Strickland, supra,* 693 F.2d at 1252 (emphasis in original).

**23.** *See Knighton v. Maggio,* 740 F.2d 1344, 1350 (5th Cir.1984).

**24.** *Strickland, supra,* —— U.S. at ——, 104 S.Ct. at 2068.

**25.** *Id.*

**26.** *Id.* (emphasis added).

**27.** *Id.* at ——, 104 S.Ct. at 2068–69.

fact-finder would have had a reasonable doubt respecting guilt." [28]

The Magistrate concluded that Nealy was not prejudiced by Burdine's failures because neither Belk nor the Jones brothers could have provided adequate alibis on which Nealy could rely. The Magistrate found that, even if Belk and the Joneses had testified at trial, all they could have established was that on the night of the murder, Nealy, Cunningham and Ewing were together at Belk's home, and that later, the same three men met the Joneses at Tom Bill Avant's. To the Magistrate, all this would merely have shown that Nealy and Ewing were together at times and places Nealy claimed, that neither one was at Davis' store at those times, and that consequently, Davis was killed at some other time.

The claim that Davis was killed at some other time, however, is precisely Nealy's theory of the case. He contends that Ewing killed Davis later in the evening after both Nealy and Cunningham had gone home and Ewing was alone. The entire thrust of Nealy's defense was that the killing occurred at some time other than when the three men were together.

Belk's testimony would have been important for two reasons. First, it might have helped to establish the whereabouts of the three men early in the evening. Second, it might have discredited Ewing's version of the facts as implausible, in that there would not have been enough time for the robbery and murder to have been planned and committed after the men left Belk's home and before they arrived at the pool hall if they remained at Belk's home for as late as Nealy maintained. Nealy testified that all three men arrived at Belk's home about 8:00 p.m. and stayed for between fifteen and thirty minutes. Belk's testimony, although more ambiguous than Nealy's, might also place the men at her home as late as 8:00. If the jury found this to be true, that would have allowed only thirty minutes after the men left Belk's home and before they arrived at the pool hall for the planning and consummation of the robbery, the concealment of the weapons, and the travel to the pool hall.

The Jones brothers also would have lent credibility to Nealy's version of the events. At the evidentiary hearing before the Magistrate, both brothers testified that they caught a ride home from Tom Bill Avant's with Nealy, Ewing and Cunningham on the night of the murder. At the trial, without the testimony of the Joneses, there was a conflict between the testimony of Nealy, who testified that the three men gave the Joneses a ride, and Ewing, who said that Nealy, Cunningham, and Ewing were the only three customers in the pool hall that evening and that they left alone. Had the Jones brothers testified and supported Nealy on this point, it would have improved Nealy's credibility with the jury, and concomitantly, diminished Ewing's. Credibility was of major importance because the state's case could not be established if Ewing had been discredited.

Although "the defendant [must] affirmatively prove prejudice," [29] there are no easily applied or specific guidelines for us to use in determining whether the inadequate performance of a defendant's counsel harmed his client "enough" to constitute a violation of the sixth amendment. The Supreme Court in *Strickland* recognized this problem, and, rather than develop mechanical rules, the Court directed us to place our "ultimate focus of inquiry . . . on the fundamental fairness of the proceeding whose result is being challenged." [30] Following this instruction, we find that Nealy has adequately established that he was prejudiced by Burdine's failure to investigate.

The verdict against Nealy rests primarily on the testimony of Wiley Ewing, Davis'

**28.** *Id.* at ——, 104 S.Ct. at 2069.

**29.** *Id.* at ——, 104 S.Ct. at 2067.

**30.** *Id.* at ——, 104 S.Ct. at 2069.

confessed killer, and is only weakly supported by other evidence. Such a verdict "is more likely to have been affected by errors than one with overwhelming record support."[31] Ewing also admitted that he actually killed Davis, but he was later prosecuted only for manslaughter, sentenced to fifteen years, and has since been released on parole. He has benefitted by his assistance to the state and his testimony might have been influenced by the hope of such benefit although he denied this at the trial and did not testify at the habeas corpus hearing.

Given that the missing witnesses directly contradict Ewing's testimony and support Nealy's theory of the case, Nealy has met his "burden of showing that the decision reached would reasonably likely have been different absent the errors."[32] Even though Burdine's errors cannot be shown by a preponderance of the evidence to have determined the outcome of Nealy's trial, they were of sufficient gravity to undermine the fundamental fairness of the proceeding and to suggest that a new trial is necessary to ensure that Nealy receives a fair trial.

For these reasons, the decision of the district court denying Nealy's petition for writ of habeas corpus is REVERSED, and the case is REMANDED to the district court for entry of an order granting the writ unless the state shall again commence proceedings against Nealy within a reasonable time to be fixed by the district court.