**UNITED STATES of America, ex rel. Mylon CROSS, Petitioner,**

v.

**Richard DeROBERTIS, et al., Respondents.**

No. 82 C 4072.

United States District Court, N.D. Illinois, E.D.

Oct. 9, 1986.

Frederick F. Cohn, Julius Echeles, Chicago, Ill., for petitioner.

Michael Weinstein, David E. Bindi, Asst. Attys. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

This case teaches the lesson that sloppy lawyering can undermine individual rights and drain judicial resources. Here, the inferior counselling of a defendant in a criminal case means that the efforts of many participants in the judicial process have been wasted and may mean that an individual has been unjustly incarcerated for eight years.

Seeking to obtain a writ of habeas corpus from this court pursuant to 28 U.S.C. § 2254, the petitioner Mylon Cross ("petitioner") has argued that he was denied his Sixth Amendment right to effective assistance of counsel in a rape trial held in September of 1978. Finding that petitioner's defense counsel at trial did not consult adequately with the petitioner before his trial, did virtually no investigation of the incidents surrounding the alleged rape, and failed to prepare a coherent defense for the trial based on the petitioner's anticipated testimony, the court concludes that defense counsel's performance at trial was deficient. Because of the unique character of the alleged crimes in this case, the court also finds that counsel's deficiencies prejudiced the petitioner's right to a fair trial. Consequently, this court issues the writ with the order that the petitioner either be given a fair trial with adequately prepared counsel or be released from custody.

### I

The procedural history of this petition for a writ of habeas corpus is a nightmare of paperwork, hearings and more paperwork. On April 28, 1978, the petitioner and co-defendant Ronald Williams ("co-defendant") were charged with having committed

the crimes of rape and deviate sexual assault. The trial judge appointed Cook County Public Defenders Xavier Velasco ("Velasco") and Vance Miner ("Miner") as defense counsel for both the petitioner and the co-defendant. Subsequently, on August 11, 1978, the state brought nine additional charges including three counts of aggravated kidnapping against both defendants.

The case proceeded to jury trial on September 11, 1978, and on September 18, 1978, the jury returned verdicts of guilty on all counts but one. The trial court, however, entered judgment only on the verdicts of rape, deviate sexual assault, three counts of kidnapping and one count of aggravated battery. On November 29, 1978, after denial of all post-trial motions, the trial court sentenced the petitioner to concurrent terms of imprisonment of 30 years for rape and deviate sexual assault and 10 years for each count of aggravated kidnapping. The trial court did not impose a sentence for the aggravated battery conviction. *People v. Williams,* 94 Ill.App.3d 241, 244–45, 49 Ill.Dec. 820, 418 N.E.2d 840 (1981). On appeal, the appellate court reversed all but the rape and deviate sexual assault convictions for violation of the Speedy Trial Act, Ill.Rev.Stat. ch. 38, ¶ 103–5 (1977). *Id.*

Having exhausted his available remedies in the courts of Illinois, the petitioner filed this petition on June 30, 1982. After consideration of the petition, the magistrate concluded on October 26, 1983 that the petitioner's due process rights had been violated and recommended to the district judge that a hearing be held on the matter. Judge Hart agreed, and on December 6, 1983, he ordered that a hearing be held before the magistrate to determine whether the petitioner's right to effective assistance of counsel had been denied. Specifically, the issues to be addressed were (1) whether petitioner's request for a change of counsel was timely, (2) whether defense counsel Velasco and Miner failed to ade-

quately prepare for trial, and (3) whether any such lack of preparation resulted in prejudice at the outcome of trial. Memorandum Opinion and Order at 5 (December 6, 1983) (Hart, D.J.).[1]

The hearing before the magistrate ("hearing") was held on December 5, 1984. After listening to the testimony of the petitioner, Velasco and others, the magistrate submitted her Report and Recommendation to this court on March 31, 1986. She first recommended that this court find that petitioner's request for change of counsel was timely. Since the Attorney General ("respondent") does not object to this first recommendation, the court adopts it. Second, the magistrate recommended that the court find that Velasco and Miner failed to prepare adequately for trial, and that defense counsel's lack of preparation prejudiced the petitioner's case. The respondent objects to this second recommendation. For the following reasons, this court agrees with the magistrate's second recommendation as well.

## II

The important facts about the relationship between the petitioner and defense counsel are undisputed. Velasco and Miner never met privately with the petitioner prior to trial. The only times that defense counsel ever discussed the petitioner's case with him were when the petitioner appeared before the trial judge for some matter. Each time the petitioner appeared, he waited behind bars in a room in the back of the trial court called the "bull pen." The bull pen is approximately fifteen by nine feet, and consists of two solid walls and two walls comprised of steel bars.[2]

The petitioner discussed his case with defense counsel only through the steel bars of the bull pen. According to the petitioner, the discussions never lasted longer than five minutes, and always took place in the presence of the co-defendant as well as

1. Judge Hart dismissed the other claims asserted in the petition. Memorandum Opinion and Order at 6 (December 6, 1983) (Hart, D.J.).

2. The magistrate personally viewed the bull pen at the trial court before she wrote her Report and Recommendation.

twelve to fifteen other inmates.[3] Defense counsel never interviewed their client at the Cook County Jail where he was incarcerated before trial even though private interview rooms were available there. Nor did they ever interview the petitioner at the public defenders' office near the trial court even though such an interview could have been arranged and facilities for such an interview were again available.

Petitioner only spoke with his attorneys between four and seven times through the bars of the crowded bull pen. Although Velasco testified that it is the policy of the public defenders' office to record each visit on the office file, no entries regarding the visits were made on petitioner's file. The petitioner testified that he never saw defense counsel take notes during the brief interviews. The file contained no notes from the interviews, and Velasco was unable to produce any at the hearing.

Although the petitioner specifically requested that they locate certain witnesses and investigate further the circumstances surrounding the alleged crimes, Velasco and Miner for purposes of investigation relied almost entirely on the notes given to them by the petitioner and assistance from the petitioner's family. Specifically, the petitioner, seeing that his opportunity to discuss his case with defense counsel was limited, gave Velasco and Miner his notes containing names of potential witnesses and what they might testify to. He also gave defense counsel a letter from his mother regarding her own investigation. Since these potential witnesses were not at the scene of the alleged rape and deviate sexual assault, their testimony would have pertained to the impeachment of the victim's testimony at trial. According to the petitioner, Velasco and Miner did not go over the details of these witnesses' potential testimony with him. Instead, defense counsel suggested to the petitioner that the potential testimony of these witnesses was irrelevant, and that all they needed was information regarding what happened the night of the alleged crimes. Moreover, other than a few perfunctory efforts at finding potential witnesses or information surrounding the incident, Velasco admitted that he and Miner relied upon the family members to locate the witnesses, even in cases where defense counsel had the potential witnesses' phone numbers. Consequently, many potential witnesses were never located or interviewed.

With respect to the presentation of the defense, it is uncontroverted that defense counsel never discussed the possibility of a plea with the petitioner. Even after the petitioner was named in nine additional charges in August of 1978, defense counsel did not discuss a plea bargain with him. After arraignment on the nine added charges, the petitioner did not see his attorneys again until the day of trial, one month later. In fact, the petitioner did not know the date of his trial until defense counsel arrived at the courthouse and informed him on the day the trial began. Velasco and Miner spent absolutely no time preparing the petitioner for his testimony at trial, discussing with petitioner the manner in which his case would be presented or informing the petitioner whether they had investigated the witnesses on his list. They simply told the petitioner on the morning of the first day of trial that they had prepared the best they could.

Nor did Velasco and Miner ever discuss the possibility of severance with the petitioner. Velasco and Miner had both been appointed to represent both of the defendants. As already mentioned, each consultation between defense counsel and the petitioner occurred in the presence of the co-defendant. Consequently, any strategic moves that defense counsel made were made from the perspective of serving the co-defendant's interests as well as the petitioner's.

## III

At trial, the state presented evidence as to what happened at the time of the alleged

---

3. Velasco claimed that the initial encounter between defense counsel and the defendants lasted fifteen to twenty minutes.

rape and deviate sexual assault solely through the testimony of the victim. The victim testified as follows. On the evening of April 12, 1978, she saw the defendants in a white Cadillac while she was on her way to the liquor store on 95th Street next to a bar known in the community as the "Stand Up Bar." She had seen the petitioner about four times before that evening, but always while in the presence of her boyfriend Willie Taylor. The petitioner called her over to the car, and when she arrived he grabbed her and shoved her inside the car. Both defendants prevented her escape by holding her and locking the car doors. The petitioner slapped her in the face and told her that he wanted her to be his whore.

The victim testified further that they then traveled to a liquor store on 103rd Street, where the petitioner ordered the co-defendant to go in and buy some liquor while he and the victim remained in the car. After the co-defendant bought some liquor, they drove to the DeGrace Hotel on Chicago's southside. In front of the hotel the petitioner brandished a gun and told the victim that if she tried to get away, he would kill her. When she attempted to flee, the petitioner ran behind her, grabbed her, slapped her and threatened again to kill her. The petitioner then gave the gun to the co-defendant who held the gun to the victim's back as they entered the hotel lobby and went upstairs to a second-floor hotel room.

According to the victim's testimony, once in the room the petitioner put on a tape recording and ordered the victim to remove her clothing. When she refused, the petitioner struck her in the face with his fist. He continued to strike her until she removed her clothes. The petitioner then forced her to the bed where he penetrated her vagina with his penis. He did not climax. The petitioner then forced her to the floor, where he beat her repeatedly across the back with a belt. The petitioner then forced her to perform fellatio upon him. When she vomited, the petitioner beat her again until, at his direction, she licked the vomit off the floor and swallowed it. The beating continued until the

defendants had forced her to submit to sexual intercourse with the petitioner five times and with the co-defendant four times. Later, the petitioner made her go into the bathroom where he forced her to kneel. He then urinated on her face.

The victim testified that the tape was playing loudly in the room through the course of the abuse. At one point, a couple of people came to the door and told the defendants that if they did not keep down the noise they would call the police.

The victim then testified that at approximately 4:00 a.m., the petitioner told the victim to turn on the lights in the room. She went toward the door, opened it and, completely naked, fled the room and then the hotel.

Other witnesses for the state testified to events that occurred before or after the alleged crimes. A cab driver and another driver both testified that they saw the victim run from the hotel and heard her yell that she had been raped. Furthermore, the state also introduced the testimony of Marie Bell, a night clerk at the hotel of approximately one month at the time of the incident. Bell testified that she saw the defendants and victim go up to the hotel room, but she did not notice the victim's face. Bell also testified that she saw the victim naked while running from the hotel. The state also produced photographs of the victim showing that her forehead and eyes were swollen and cut and that her back was permanently scarred after the incident.

The co-defendant did not testify. The petitioner, however, did take the stand and testified as follows. He met the victim in January of 1978, three months before the incident in April of that year. In the course of those next three months, the petitioner spent time with the victim approximately five days a week, and over thirty times outside of the presence of Willie Taylor. Prior to April 12, 1978, the petitioner had been alone with the victim in his room many times, and engaged in sex with her approximately twenty times.

The petitioner testified that people saw him and the victim together on many occa-

sions. Specifically, he testified to three separate incidents that occurred prior to April 12, 1978. The first occurred outside the Stand Up Bar on 95th Street on or about March 22, 1978. On that date the petitioner pulled his car up to the bar, and saw the victim with Willie Taylor. She tried to walk over to talk to the petitioner, but Taylor stopped her by pulling out some weapon. The second incident also occurred on or about March 22. On that night, the petitioner had picked up the victim and his friend, Perry McAdoo, and brought them to the petitioner's sister's home. During the course of the evening, a number of people saw the victim and the petitioner together, including moments where the victim and petitioner were naked together on a couch. Finally, on or about April 5, 1978, one week before the night of the alleged crimes, the petitioner, the victim, Willie Taylor and many others were present at the Shell Gas Station on 95th and LaSalle Streets at approximately 6:00 p.m. At that time, the petitioner and Willie Taylor argued over the rights to the victim, and the victim made a gesture indicating that she preferred the petitioner.

With respect to the events that occurred on April 12, 1978, the petitioner testified that he and the victim were drinking together all afternoon starting at approximately 12:00 p.m. with friends at a home in the neighborhood. He left at approximately 5:30 p.m. for the DeGrace Hotel, where he had a room. At about 8:00 p.m., he and the co-defendant arrived in their car at the Stand Up Bar on 95th Street. The petitioner asked the victim if she wanted to drive to the bar at 103rd Street with them. She said yes, and together they drove to 103rd Street, where they met Perry McAdoo for a few drinks. Together they drank steadily in the bar at 103rd Street for approximately two hours. They left the bar between 10:00 and 10:30 p.m., and were planning on following Perry McAdoo to his new home. When the petitioner lost McAdoo's car as he tried to follow it, the petitioner, the victim and the co-defendant drove to Bernard's Lounge on 79th and South Shore Streets, where they drank heavily for another one to two hours. When they left

Bernard's, all three were "wasted." When asked if he had kept the victim with them against her will at any time that night, the petitioner testified he had not.

The petitioner then drove to the DeGrace Hotel with the co-defendant and the victim. Together they walked through the hotel lobby. No one had a gun. They entered the second-floor room, where the petitioner put a tape in the tape deck and stripped down to his underwear. The co-defendant then left the room to purchase cigarettes. After the co-defendant left, the victim took her clothes off and slipped under the bedsheets. The petitioner, sitting in a chair across from the bed, fell asleep. When he awoke at approximately 4:00 a.m., the victim was gone but the co-defendant had returned. The petitioner testified that he did not engage in sex with the victim that evening. After he left the hotel, however, he did notice that the co-defendant had fresh scratches on his face. When asked what the cause of the victim's injuries was, the petitioner testified he did not know.

In rebuttal, state's attorney Jonathan Lerner testified that on the morning of April 13, 1978, the petitioner told him that the co-defendant had borrowed the petitioner's car on April 12. Petitioner told Lerner that he left his mother's house to find the co-defendant, and that at around 4:00 a.m. the petitioner arrived at the DeGrace Hotel, where a parking ticket was sitting on the front of his car. He went up to the room, argued with the co-defendant about the ticket, then left with the co-defendant. Lerner testified that the petitioner told Lerner that he did not see the victim in the hotel room when he arrived at 4:00 a.m.

Aside from the testimony of the petitioner, the defendants' evidence at trial consisted of the testimony of four witnesses, each of whom was either a relative or close friend of the petitioner. The petitioner's sister and her son both testified that they saw the petitioner with the victim at her house on or about March 22, 1978. Perry McAdoo, the petitioner's friend of over twenty years, testified that he also saw the petitioner and victim at the petitioner's sis-

ter's on March 22. Moreover, McAdoo testified that he was with the petitioner and the victim on April 12, 1978 at the bar at 103rd Street. He saw them together on a number of other occasions as well. Finally, another friend of over twenty years, Sydney Burt, testified that he had seen the Shell Gas Station incident in March of 1978, and that he had seen the petitioner and victim together before April 12, 1978. He also testified that he saw them drinking together the evening of the alleged crimes.

The list of potential witnesses who could have been called to testify but were not dwarfs the list of those who were called. With regard to the occurrences at the DeGrace Hotel, the petitioner had asked defense counsel to investigate the victim's claim that tenants were beating on the hotel-room walls and complaining about the noise she was making in the room. The petitioner wanted to find out if any tenants would testify on his behalf to rebut the victim's story. He also wanted Velasco and Miner to call Ms. Rollins, the other and more-experienced night clerk, to the stand. According to the police report, Ms. Rollins knew both defendants and had observed them with the victim as they entered the hotel. She also told the police that the co-defendant had been to the hotel earlier that evening at 11:00 p.m. and requested a pass key to the petitioner's hotel room.

Defense counsel never visited the hotel. With respect to the tenants, Velasco and Miner did no investigation.[4] Velasco testified at the hearing that he thought that he had phoned Ms. Rollins, but could not provide details of the conversation or notes taken regarding the call. When questioned at the hearing, Velasco admitted that Ms. Rollins was an important potential witness who could verify the defendants' version of how the three entered the hotel. As noted earlier, Marie Bell, the other night clerk, did testify and was cross-examined by defense counsel. Her testimony corroborated the petitioner's, but she admitted she never

saw the victim's face and that she had only been working for one month.[5] Furthermore, it appears defense counsel never spoke to Bell prior to her taking the stand even though the petitioner had asked them to do so.

The petitioner also had asked Velsaco and Miner to question the owner of the Stand Up Bar, a man known as "Chick." The petitioner believed that Chick would testify that the petitioner and victim oftentimes frequented Chick's bar together prior to April 12, 1978. Moreover, the petitioner thought that Chick might have been present during a phone call placed by the victim from the Stand Up Bar to the petitioner at the Cook County Jail after the alleged crimes. At the hearing, the petitioner testified as follows regarding what he told Velasco:

> I told him that she had called me in the county jail, and the content of the conversation was that she was asking me why I had did her like I did by putting her out of my place after me and her and Willie [Taylor] had went through an ordeal in which she left him. And while she was talking to me, I asked her who was around.... I had her to tell Chick to come to the telephone....

> Transcript of Hearing Before Magistrate Humphrey-Lefkow at 20 (December 5, 1984).

Finally, the petitioner also told defense counsel that Chick might have witnessed what happened at the car outside of the Stand Up Bar on April 12, 1978 or might have known of someone who saw it.

Velasco testified that defense counsel and an investigator went to the Stand Up Bar to talk to Chick. They saw an individual who fit the petitioner's description of Chick, but "were not successful" in going inside the bar to check. *Id.* at 47. They left without finding out any information, and never returned.

---

4. Velasco admitted at the hearing that an investigator was available to them at the public defenders' office to do this and other investigatory work.

5. Defense counsel had no apparent way of anticipating that Bell's testimony would be corroborative. The police report reflected that Bell stated she did not know the tenants and paid little attention when the three entered.

Willie Taylor, the victim's boyfriend, was present at a number of the occurrences outlined by the petitioner in his trial testimony. The petitioner, while in jail, had written Taylor in the hopes that they could reconcile their differences, and had given defense counsel a copy of the letters which included Taylor's address. Yet, defense counsel did not subpoena Taylor to testify at trial or even attempt to interview Taylor. When asked why at the hearing, Velasco stated because Taylor was "adverse" to his client. Velasco, however, only heard about Taylor through his clients. Taylor made no statement to the police which could be found in the police report. Consequently, Velasco's belief that Taylor would be adverse was unsubstantiated.

The petitioner also asked defense counsel to interview a number of potential witnesses to the events that occurred at the Shell Gas Station. Specifically, the petitioner asked them to question John Morris, an attendant at the station, about a moment where Willie Taylor came up to the victim and held a knife to her throat while she was with the petitioner at the gas station. The petitioner also told defense counsel to question the two police officers who saw the knife incident at the station, stopped their cars, then took Taylor's knife from him as he walked from the scene. Moreover the petitioner told Velasco and Miner that a "Mr. West" was present at the gas station at the time of the incident, knew everyone in the neighborhood, and could tell defense counsel the names of the others in the crowd.

As already noted, defense counsel did call the petitioner's close friend Sydney Burt to testify about the gas station incident. Velasco testified at the hearing that John Morris told him he could not remember the incident. Neither counsel, however, attempted to contact the police officers who arrived at the gas station, nor did they subpoena police department records to find out whose beat the station was in even though counsel knew the date and approximate time of the incident. Counsel failed

to investigate further even though he recognized, as he testified at the hearing, that police officers oftentimes are perceived by jurors as credible and trustworthy.

In addition, the petitioner told defense counsel that Kenneth Wesley and a man named Willard had seen him with the victim on prior occasions, and asked counsel to investigate further. Counsel never pursued the matter. Petitioner told counsel to ask Perry McAdoo for the name of the bartender present at 103rd Street on April 12, and to question Mr. Martin, the owner of the bar, about what he saw that evening. Apparently counsel did neither.

The petitioner finally told Velasco and Minor to question the police officers who ticketed his car in front of the hotel the night of April 12. The police officer handed the ticket to the co-defendant, who had left the room to buy cigarettes and tried to talk the officer out of writing the ticket. The petitioner believed the officer's testimony would rebut the victim's anticipated testimony that neither defendant had left the room after they entered it with her that night.[6] The state did call the officer as a witness, and he testified as the petitioner expected he would. Defense counsel, however, did not question the officer prior to trial or do any other investigation in that regard.

In summary, to prepare for what turned out to be a five-day trial on extremely serious charges, defense counsel never met with the defendants except for brief periods of time in the crowded bull pen. They never prepared the petitioner for his testimony at trial, only prepared the other defense witnesses in the courtroom before they testified, and did not even call many critical corroborative witnesses to the stand. They never went to the scene of the alleged crime to investigate, made half-hearted efforts to question some potential witnesses while never talking to many others, and essentially relied on the incarcerated petitioner and his family to provide them

---

6. The victim's testimony at trial implied that both defendants remained in the hotel until she

escaped, but she did not explicitly state they did.

with the information necessary to try a rape case in which the central issue was the credibility of the victim and defendants.

In closing argument, the state repeatedly pointed to the apparent bias of the witnesses for the defense. "Who had a greater stake in the outcome of this trial than the four people that were paraded before you," the state's attorney argued. Trial Record at 511. The state's attorney argued that the victim, on the other hand, had no reason to lie. *Id.* at 531. The petitioner, the state pointed out, was unable to put on any neutral witnesses, whereas the state put on many. *Id.* at 532. The state's attorney's final remarks included the following:

> Ladies and gentlemen, what you have in this case is basically a what-do-you-be-lieve case.... Now in this incredible case, are you going to believe [the victim] who has no reason to lie? They have given you no reason why she would lie, why she would pick out these two men of any number of men, against the testimony of Mr. Cross who had ample reason to lie.
>
> *Id.* at 544.

The closing argument for the defense merely urged the jury to disbelieve the victim's testimony. Defense counsel did not indicate a factual theory that might have led the jury to entertain a reasonable doubt. Both defendants were convicted and incarcerated. Eight years later, petitioner's request for a writ of habeas corpus ends up before this court on the grounds that the petitioner was denied his constitutional right to effective assistance of counsel.

## IV

The Supreme Court recently formulated the standard to be applied when reviewing a claim of ineffective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court announced that the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

104 S.Ct. at 2064. Specifically, two separate components of the petitioner's claim must be reviewed. First, the petitioner must show that counsel's performance was deficient so as not to function as the "counsel" guaranteed by the Sixth Amendment. Second, the petitioner must show that counsel's deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose result is reliable. *Id.*

### A.

■ The proper standard for attorney performance is that of reasonably effective assistance. *Id.* When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 2065. The Court did not deem specific guidelines for this determination to be appropriate. *Id.* The proper measure of attorney performance remains simply reasonableness under prevailing professional norms considering all the circumstances surrounding the case. *Id.* Prevailing norms of practice, however, such as the American Bar Association Standards for Criminal Justice 4-1.1 to 4-8.6 ("The Defense Function") (2d ed. 1979), may serve as guides to what is reasonable. *Id.*

The petitioner identified three areas in which defense counsel's representation failed to meet prevailing professional standards. First, defense counsel failed to establish and maintain the requisite confidential relationship with their client, the petitioner. Second, Velasco and Miner failed to conduct reasonable investigations or make reasonable decisions that particular investigations were unnecessary. Third, defense counsel failed to call or to prepare certain critical witnesses for trial. The court will deal with each of the allegations in turn.

■ The cornerstones of effective assistance of counsel are the informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of the client's

case. *Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir.1978). Adequate consultation between the attorney and the client is an essential element of competent representation of a criminal defendant. *United States v. Tucker,* 716 F.2d 576, 581 (9th Cir.1983). While the amount of consultation required will depend on the facts of each case, the consultations should be sufficient to determine all legally relevant information known to the defendant. *Id.* (the court held that seven hours of telephone conversation with the defendant in a complicated tax fraud case were inadequate).

The ABA Standards for Criminal Justice ("The Defense Function") state that "defense counsel should seek to establish a relationship of trust and confidence with the accused." Standard 4–3.1(a). Moreover, the ABA Standards provide that "to ensure the privacy essential for confidential communication between lawyer and client, adequate facilities should be available for private counsel and accused in jails, prisons, courthouses, and other places where accused persons must confer with counsel." Standard 4–3.1(c). When interviewing a client, the lawyer should seek to determine as soon as practicable "all relevant facts known to the accused." Standard 4–3.2(a). Finally, with respect to the attorney's relationship with the client, the attorney "has a duty to keep the client informed of the developments in the case and the progress of preparing the defense." Standard 4–3.8.

Velasco and Miner failed to fulfill their duties in this regard. Their omissions are virtually endless. Counsel never met privately with the petitioner, nor did they keep the petitioner informed of the progress of his case. They did not meet with the petitioner for more than brief periods of time through the bars of the bull pen, did not take notes of any interviews that occurred, and did not meet with him at all for the entire month before trial. Velasco and Miner did not prepare the petitioner to testify at trial, and appear to have been caught off guard by some of his testimony as it arose.[7] Certainly, performance such as this does not conform to any conception of what reasonably competent assistance consists of.

Moreover, even if one were to assume that counsel was fully aware of what the other witnesses as well as the petitioner would testify to, counsel would have been in a position to recognize that, if the only witnesses the defense put on would appear biased, the evidence as a whole might favor the government. The petitioner would admit that he was in the hotel room with the victim. The government would present contemporaneous photographs of a beaten woman right after the alleged crimes. Yet defense counsel never discussed with their client the probable outcome of the trial and the possible entry of a plea.[8] *See* Standard 4–6.1.

In his original petition for a writ of habeas corpus, the petitioner also claimed that defense counsel's joint representation of the petitioner and the co-defendant violated the petitioner's Sixth Amendment right to effective assistance of counsel. Judge Hart, however, dismissed this portion of the petition primarily because petitioner did not object to the joint representation at or before trial.[9] Memorandum Opinion and

---

7. The court, for purposes of comparison, notes that the respondent interviewed Velasco for two hours in preparation for Velasco's testimony at the hearing.

8. As the respondent points out, defense counsel's failure to discuss plea negotiations did not prejudice the petitioner's right to a fair trial. The failure does, however, further substantiate the claim that counsel's performance was deficient.

9. The petitioner, however, did move for the appointment of new counsel on the day of trial just prior to jury selection:

The Court: Ask for a change of counsel?
A: Yes, sir.
The Court: Today?
A: I just found out negative information, and today—yes, I'm asking today.
The Court: Motion is denied. What is the reason? What did you find out?
A: I was told that I'd have conferences that I never got, okay. I was told that certain wit-

Order at 5-6 (December 6, 1983) (Hart, D.J.) Because the petitioner had failed to raise the conflict-of-interest claim at or before trial, according to *Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980), the petitioner had to demonstrate that an actual conflict of interest affected his lawyer's performance. Since the petitioner was unable to show a specific result at trial of the possible conflict, the claim was dismissed.[10] *Id.*

Defense counsel's failure to discuss privately with the petitioner the wisdom of conducting a common defense or the possibility of a severance, however, is a significant omission. Since counsel failed to meet with the petitioner at all for an entire month before trial, and since prior meetings always were conducted in the presence of the co-defendant, the court doubts that the petitioner could raise the conflict-of-interest issue at the prior meetings or recognize a conflict before trial. The court recognizes that the petitioner bears the burden of showing deficient counsel and that speculation alone about what might have happened had counsel acted otherwise is inappropriate; yet, the court mentions these omissions to add further detail to the larger picture of defense counsel's representation generally.

Respondent cites *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) for the proposition that the Sixth Amendment does not guarantee a "meaningful attorney-client relationship." 461 U.S. at 13-14, 103 S.Ct. at 1617. The focus of the Sixth Amendment analysis is on counsel's ability to test the government's case through adversarial confrontation, not on his relationship with the client. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). Regardless of whether this court agrees with the respondent's interpretation of *Morris,*[11] the court finds that defense counsel's failure in this regard certainly affected the presentation of the defense at trial, as exemplified in defense counsel's neglecting to argue a coherent theory consistent with the petitioner's testimony.

The second area of deficient representation identified by the petitioner concerns defense counsel's failure to investigate a number of matters they reasonably should have. The court has already identified defense counsel's specific omissions in this regard. *See supra* at 688-90. The court further notes that the failure to investigate alone has been recognized as unreasonable assistance in a number of instances. *See Rogers v. Israel,* 746 F.2d 1288, 1295 (7th Cir.1984) (defense counsel's failure to inquire into the possibility of expert testimony was unreasonable); *Crisp v. Duckworth,* 743 F.2d 580, 583-85 (7th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) (failure to investigate was unreasonable but not prejudicial); *Tucker,* 716 F.2d at 582-83 (defense counsel's failure to conduct a thorough pre-trial investigation was unreasonable); *Goodwin,* 684 F.2d at 817. Effective representation hinges on adequate investigation and pre-trial preparation.

nesses that I had advised him of from day one, that wasn't [sic] needed, and now they would get in touch with them, and they are unavailable now, and it seemed like they are not trying to get my case together. All the points that I think it [sic] relevant to my case seem like they have been ignored.

The trial court then asked defense counsel to respond.

Mr. Miner: I don't think we should respond to that. We feel we are preparing the case.

The Court: You feel you have prepared the case properly and that these people are not necessary, or you have decided that they should not be put on?

Mr. Miner: We'll say that we have prepared this to the best of our ability and we feel we have done the best job we can in preparing this case and overlooked [sic] any particular areas.

The Court: Motion is denied. Let's go to trial. Trial Record at 6-8.

10. The court recognizes that a strict application of the *Cuyler* standard requires that the conflict-of-interest claim be dismissed. Consequently, the court does not use the apparent conflict-of-interest as a means of presuming prejudice. *See Strickland,* 104 S.Ct. at 2067.

11. The cited portions of *Morris* arguably are dicta in light of other portions of the *Morris* opinion. 461 U.S. at 4, 103 S.Ct. at 1612 (the court stated that grounds existed for rejecting petitioner's claims independent of the Sixth Amendment claim).

*Crisp,* 743 F.2d at 583. An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense. *Goodwin,* 684 F.2d at 805. The ABA Standards recognize a duty on the part of defense counsel "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case. . . ." Standard 4–4.1.

Defense counsel's file was devoid of notes on investigation. They failed to investigate the witnesses who were nearest the scene or who might have impeached the victim's testimony that she barely knew the petitioner. Such failures could not have been based on strategic choices; consequently, the court finds defense counsel's performance in this regard to have been deficient as well.

Finally, the petitioner criticizes defense counsel's failure to call certain witnesses and prepare those witnesses who did testify. Although Velasco and Miner did not thoroughly prepare those witnesses who did testify, the evidence shows that defense counsel did spend some time with the witnesses before they took the stand. But the rejection of other witnesses, most of whom defense counsel never interviewed, falls below minimal levels of competence. *See United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658 (7th Cir.1984). The apparent bias against the petitioner of witnesses such as Willie Taylor is insufficient alone to automatically reject him. *See id.* at 653 n. 3. Simply put, no strategy was involved in not calling these other witnesses at trial, just negligence. *See id.*

▮ The court adds that mechanical attempts to categorize the omissions of defense counsel in this case do an injustice to the petitioner's claim. One need only read through the facts discussed earlier to recognize that defense counsel did not prepare adequately for a rape trial. Although one of the omissions alone may not have amounted to ineffective assistance, the sum of all the omissions certainly does. *See id.* at 585.

**B.**

▮ Error by counsel, even if professionally unreasonable, do not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland,* 104 S.Ct. at 2067. The general requirement is that the petitioner must affirmatively prove prejudice. *Id.* It is not enough for the petitioner to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* On the other hand, the petitioner need not show that counsel's deficient conduct more likely than not altered the outcome in the case. *Id.* at 2068. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The court finds prejudice as well as deficient assistance in this case. Since by its very nature the crime of rape most often is committed outside the presence of witnesses other than the victim and defendant, rape trials generally can be narrowed down to the question of who will the jury believe. In this case, the victim testified on the stand that she had virtually no prior relationship with the petitioner. The defense attempted to impeach her testimony only through the testimony of four witnesses easily perceived as biased. Defense counsel's failure to put on any "neutral" witnesses was the focus of the government attorney's closing, a closing in which he said credibility was the central issue in the case.

The list of potential neutral witnesses that defense counsel could have called but did not is long—the night clerk Ms. Robbins, the victim's boyfriend Willie Taylor, the policemen at the gas station, the owners of the respective bars, and others. The court finds that a reasonable probability exists that had defense counsel put on neutral witnesses to impeach the testimony of the victim, her credibility would have been shaken sufficiently such that the outcome would have been different. Because of a mistake in obtaining the smears at the hos-

pital, the state was unable to establish that semen had been in the victim's body. No other evidence of penetration was introduced. Moreover, the evidence technician who examined the room testified that he observed no semen stains in the room. Furthermore, a gun was never recovered. The sole evidence of force was the testimony of the victim and the photographs of her taken subsequent to the alleged crimes.

A number of witnesses could have testified and shaken the credibility of the victim regarding what happened on April 12, 1978. For example, a number of individuals were drinking with the victim on that afternoon while the petitioner was present and could have testified to that effect. Patrons of Barnard's Bar and the bar at 103rd Street could have testified they saw the victim drinking with the petitioner. Moreover, they might have been able to testify she was intoxicated, further discrediting her testimony as to what happened. The importance of attacking the credibility of the victim was particularly important in light of Lerner's testimony impeaching the petitioner. *See supra* at 688. Moreover, a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. *Strickland,* 104 S.Ct. at 2069. Since the core of the state's case depended on just the testimony of the victim, failure to properly impeach her appears particularly prejudicial.

The respondent argues that the testimony of Marie Bell negates any prejudice caused by the failure of Ms. Rollins to testify. Bell, however, admittedly did not observe the victim and the defendants carefully that night, and testified that she did not know them because she was a new employee. By contrast, Ms. Rollins apparently knew both defendants and was a long-time employee of the hotel. As such, her testimony very likely would have been more complete than Bell's and carried greater weight with the jury. Furthermore, her testimony that she saw the co-defendant come in earlier that night and ask for a pass key to the petitioner's room was something Bell did not testify to.

In addition to failing to present available evidence that would have shaken the credibility of the victim, defense counsel failed to establish a motive for her arguably false testimony or to introduce available evidence to support a motive. For example, if defense counsel had called witnesses to show that, because of prior disputes between Taylor and the petitioner and because Taylor was again the victim's boyfriend, she had a motive to accuse the petitioner, the outcome reasonably might have been different.

Although it is difficult to pinpoint the prejudice to the petitioner of defense counsel's failure to do any reasonable investigation generally, the court can specify that the failure of Velasco and Miner to go to the scene of the incident, question the tenants of neighboring rooms, or subpoena the hotel guest-list for that evening clearly prejudiced the petitioner. As already mentioned, the victim testified that neighboring tenants complained about her screams that evening to the defendants while in the hotel. Testimony of a tenant or evidence from the hotel inconsistent with the victim's testimony on this matter would have been the center of the defendants' case, for it would have gone directly to the period of time during which the alleged crimes occurred.

While in some cases a court may require that a petitioner locate the potential witnesses and have them testify at the hearing, the court finds that such testimony is not necessary in this case. The petitioner testified at the hearing as to the existence and potential testimony of these witnesses. Velasco's own testimony confirmed that the petitioner had told defense counsel prior to trial of the existence of these potential witnesses. The record indicates that either the petitioner gave defense counsel the phone numbers of these witnesses or that defense counsel easily could have located them. Therefore, ad hoc fabrication of these witnesses after a conviction is not at issue. Furthermore, Judge Hart when he remanded the case to the magistrate did not order that the petitioner locate these witnesses and have them testify; he merely ordered that there be a hearing partially

on the issue of whether any lack of preparation resulted in prejudice to the outcome at trial. Memorandum Opinion and Order at 5 (December 6, 1983) (Hart, D.J.). Although the proper course for the petitioner would have been to call these potential witnesses at the hearing, in light of the other deficiencies of counsel, the corroborative evidence of what the potential testimony would have been,[12] and the ambiguity of Judge Hart's order, the court finds that the failure to call the potential witnesses does not undermine petitioner's claim of prejudice.

The respondent cites three cases for the proposition that a habeas petitioner must offer specific proof of what those potential witnesses had to offer in order to establish prejudice from the failure to investigate potential defense witnesses. *Nealy v. Cabana,* 764 F.2d 1173, 1179–80 (5th Cir. 1985); *Keys v. Duckworth,* 761 F.2d 390, 394 (7th Cir.1985); *Crisp,* 743 F.2d at 584–86. The court rejects such an interpretation of these cases. In *Nealy* and *Crisp,* the courts merely state that the petitioner did call certain potential witnesses, not that they were required to do so. *Nealy,* 764 F.2d at 1179; *Crisp,* 743 F.2d at 585. *Keys* simply does not discuss this issue.

Moreover, Velasco testified at the hearing that he did not even attempt to contact any of these potential witnesses. Viewing this along with the other derelictions of defense counsel in this case, the court sees a picture of unprepared attorneys trying a serious criminal case. Forcing the petitioner to show specific prejudice resulting from his counsel's unpreparedness imposes an unfair burden on the petitioner. Where, as in this case, defense counsel did not attempt to obtain corroborating witnesses or otherwise to conduct a minimal pretrial investigation, the record is necessarily incomplete as to the extent of the prejudice which resulted from counsel's dereliction. *Tucker,* 716 F.2d at 593. It would be anomalous for the court to decide that a near-total failure to prepare for trial and present all corroborative witnesses demonstrates

incompetence of counsel, but then to deny any relief because the defendant cannot point to the rest of the record to show how the omissions affected the judgment, especially in a jury trial where no findings of fact are made. *See id.*

Finally, the court finds that petitioner's case was prejudiced by the dual representation of defense counsel. Because Velasco and Miner represented both the petitioner and the co-defendant, defense counsel were unable to argue for the petitioner the only apparent theory that consistently incorporated the victim's injuries with the petitioner's testimony, i.e., that the co-defendant committed the crimes by himself while the petitioner was passed out due to the effects of drinking all day. Although the appellate court of Illinois condemned the petitioner for not asking for new counsel before trial, this court notes the patent unfairness of such a requirement. The petitioner did not meet with his attorneys or appear before the trial court for a full month before the trial. When he did appear, he immediately made the request but was summarily denied by the trial judge. For those meetings that did occur with defense counsel, the co-defendant was always present. The petitioner did not have the opportunity to discuss a coherent defense theory with defense counsel or to obtain an attorney who would give him the opportunity to have such a discussion outside the presence of the co-defendant.

The court in *Strickland* expressly stated that it was not seeking to establish mechanical rules. 104 S.Ct. at 2069. The ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* Once again, the court points to the lengthly factual statement at the start of this opinion as one basis for a finding of prejudice. Had defense counsel performed all the investigations and interviews that this court found they did not, a reasonable probability exists that the outcome of the trial would have been different. Using the Supreme Court's language in *Cronic,* this court holds that under the circumstances disclosed the defendant was not accorded the

---

12. For example, the police had a statement of Ms. Rollins that corroborated the petitioner's

testimony as to what Ms. Rollins would have testified to at trial.

right to counsel in any substantial sense. To decide otherwise would simply be to ignore actualities. *Cronic,* 104 S.Ct. at 2048 n. 27 (quoting *Powell v. Alabama,* 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932)).

## CONCLUSION

A reading of the trial record indicates that defense counsel performed adequately at trial to the extent they were prepared to do so. Unfortunately, their lack of communication with a client facing extremely serious charges, lack of reasonably-thorough investigation and apparent lack of preparation in formulating a coherent theory of defense resulted in a substandard presentation. The court is compelled to conclude that counsel in this particular case omitted essential aspects of effective representation and that these omissions created a reasonable probability that the outcome was affected.

Let the writ of habeas corpus issue. It is ordered that the petitioner Mylon Cross be afforded a new trial or that he be released from custody.